[764 NYS2d 129]

In the Matter of Norman D., Appellant. Commissioner of the New York State Office of Mental Health, Respondent.

Second Department, September 8, 2003

**APPEARANCES OF COUNSEL**

*Mental Hygiene Legal Service,* Mineola (*Sidney Hirschfeld, Felicia B. Rosen* and *Dennis B. Feld* of counsel), for appellant.

*Eliot Spitzer, Attorney General,* Albany (*Peter H. Schiff* and *Julie S. Mereson* of counsel), for respondent.

*Donald A. Williams, District Attorney,* Kingston (*Paul Tsui* of counsel), amicus curiae.

**OPINION OF THE COURT**

KRAUSMAN, J.

The current version of CPL 330.20, enacted as part of the Insanity Defense Reform Act of 1980 (L 1980, ch 548), permits an individual who has been found not responsible for a crime due to mental illness to be committed to a secure psychiatric facility upon a finding that he or she is suffering from a "dangerous mental disorder." This initial determination that an insanity acquittee suffers from a dangerous mental disorder has lasting consequences because it establishes his or her "track status" for all future proceedings. An insanity acquittee committed to a secure facility may seek permission by an intermediate appellate court to appeal the commitment order (*see* CPL 330.20 [21]), or may obtain a "rehearing and review" of the order in the Supreme Court (CPL 330.20 [16]). On appeal, we are asked to resolve issues relating to the nature and scope of the rehearing and review proceeding. For the reasons which follow, we reject the appellant's argument that the rehearing and review proceeding may be used, as an alternative to appellate review, to modify the track status established by the initial commitment order. Accordingly, the Supreme Court properly concluded that all future proceedings concerning the appellant's confinement continue to be governed by CPL 330.20, despite the fact that his condition has now improved to the point where it is undisputed that he is no longer dangerous.

On the afternoon of April 19, 1997, the appellant Norman D. became enraged, assaulted his wife, and set fire to a couch in their trailer home. Although Norman D.'s wife and children fled to safety, he remained inside the trailer, standing in front of a wall of flames, until the police arrived and dragged him out. Ten months later, on February 24, 1998, Norman D. entered a plea of not responsible by reason of mental disease or defect to an Ulster County indictment charging him with arson in the third degree. In accordance with the requirements

of CPL 330.20, the County Court, Ulster County, ordered Norman D. to submit to a psychiatric examination, and conducted a hearing to determine his present mental condition. At the hearing, a psychiatrist testified on behalf of the People that Norman D. suffered from a recurring major depressive disorder, which caused him to lose touch with reality, hear voices, and become paranoid. Although Norman D. presented the testimony of a psychologist who believed that his depressive disorder was in remission, the County Court credited the testimony of the People's expert, and found, by order dated June 19, 1998, that Norman D. suffered from a dangerous mental disorder as defined by CPL 330.20 (1) (c). Based upon this finding, the June 19, 1998, order committed Norman D. to the custody of the Commissioner of the New York State Office of Mental Health (hereinafter the Commissioner) for confinement in a secure psychiatric facility for a period of six months. Pursuant to the commitment order, Norman D. was confined at the Mid-Hudson Psychiatric Center in Orange County.

Shortly thereafter, Norman D. filed a petition, pursuant to CPL 330.20 (16) and Mental Hygiene Law § 9.35, seeking a rehearing and review of the initial commitment order, and demanding a jury trial on the issue of whether he suffered from a mental illness. Although the Supreme Court, Orange County, granted the petition on July 29, 1998, the rehearing and review proceeding was repeatedly adjourned over the next three years. Meanwhile, in February 2001, the Commissioner applied for an order to transfer Norman D. to a nonsecure facility upon the ground that he no longer suffered from a dangerous mental disorder. The Commissioner also separately moved to vacate the 1998 order which had granted Norman D.'s petition for a rehearing and review of the initial commitment order. When the parties appeared in Supreme Court on April 4, 2001, Norman D. withdrew his demand for a jury trial, and the parties stipulated that while he was still mentally ill, he no longer suffered from a dangerous mental disorder. Upon consent of the parties, the Supreme Court granted the Commissioner's application for an order transferring Norman D. to a nonsecure facility, and issued an order of conditions governing his treatment.

Eight months later, by order dated December 18, 2001, the Supreme Court, in effect, denied the Commissioner's pending motion to vacate the July 1998 order granting Norman D.'s petition for a rehearing and review of the initial commitment order. The Supreme Court indicated that it had examined the

transcript of the initial commitment hearing conducted by the Ulster County Court in 1998, and that the evidence presented at that hearing supported the original determination that Norman D. suffered from a dangerous mental disorder. Since Norman D. was suffering from a dangerous mental disorder at the time the initial commitment order was issued, the Supreme Court concluded that all future proceedings concerning his retention and release should be governed by the criminal commitment provisions of CPL 330.20, rather than the provisions of the Mental Hygiene Law which apply to involuntarily-committed civil patients. Norman D. now appeals from so much of the Supreme Court's December 2001 order as determined that he remains subject to the provisions of CPL 330.20. The Insanity Defense Reform Act of 1980 (hereinafter the Act) significantly changed postverdict procedures for those individuals acquitted of a crime by reason of mental disease or defect (*see Matter of Jill ZZ.,* 83 NY2d 133, 137 [1994]). The current version of the statute was "prompted by concern both that the convicting court lacked continuing supervision over the acquittee, and that once committed, acquittees are constitutionally entitled to essentially the same treatment as involuntary patients generally" (*id.* at 137, citing 1981 Report of NY Law Rev Commn, Appendix A, *The Defense of Insanity in New York State,* reprinted in 1981 McKinney's Session Laws of NY, at 2261-2266). Reflecting these dual concerns, the Act extends many of the rights afforded to involuntary civil patients to "insanity acquittees," while also increasing "the participation of society, through the involvement of courts and the district attorney, in the release and transfer of 'insanity acquittees'" (*see* Weyant, *Reforming Insanity Defense Procedures in New York: Balancing Societal Protection Against Individual Liberty,* 45 Alb L Rev 679, 704-705 [1981]).

CPL 330.20 (2), as presently enacted, requires that immediately following a verdict or the acceptance of a plea of not responsible by reason of mental disease or defect, the court must issue an examination order. The Commissioner is then required to designate either two psychiatrists, or one psychiatrist and one psychologist, to examine the acquittee (*see* CPL 330.20 [3]). The examination order authorizes the Commissioner to confine the acquittee to a secure facility for an initial period not exceeding 30 days, which may, upon application, be extended for an additional period of up to 30 days "when a longer period is necessary to complete the examination" (CPL 330.20 [4]). Once an examination has been completed, each

"examiner must promptly prepare a report of his [or her] findings" for submission to the Commissioner and the court (CPL 330.20 [5]). Within ten days of the submission of the report, the court must conduct an initial hearing to determine the defendant's present mental condition (CPL 330.20 [6]). It is this initial hearing which determines the acquittee's track status (*see People v Stone,* 73 NY2d 296, 300 [1989]). If the acquittee is found to have a dangerous mental disorder (track one), a commitment order confining him or her to a secure psychiatric facility for an initial period of six months must be issued. A track one defendant who is committed to a secure psychiatric facility cannot be transferred, conditionally released, granted a community furlough, or discharged without court approval (*see* CPL 330.20 [8]-[14]). In addition, the district attorney must be given notice of all proceedings related to a track one acquittee's retention, furlough, transfer, conditional release, or discharge (*see* CPL 330.20 [8]-[14], [18]).

If the acquittee does not have a dangerous mental disorder but is mentally ill (track two), the court must issue both an "order of conditions," which may direct an acquittee to comply with a prescribed treatment plan, and an order committing him or her to the custody of the Commissioner. In such a case, "[t]he latter order shall be deemed an order made pursuant to the mental hygiene law and not pursuant to this section, and further retention, conditional release or discharge of such defendant shall be in accordance with the provisions of the mental hygiene law" (*see* CPL 330.20 [7]). Finally, if the court finds that an acquittee is not presently suffering from a mental illness (track three), he or she must be discharged, either unconditionally or with an order of conditions (*see* CPL 330.20 [7]).

An acquittee found to be dangerous and assigned track one status may seek permission to appeal to an intermediate appellate court (*see* CPL 330.20 [21] [a] [ii]). In addition, an acquittee who is "dissatisfied" with a commitment order, but who has not taken an appeal, may "within thirty days after the making of such order, obtain a rehearing and review of the proceedings and of such order in accordance with the provisions of section 9.35 or 15.35 of the mental hygiene law" (CPL 330.20 [16]). Such a rehearing and review is a de novo proceeding, which is designed to ascertain the insanity acquittee's mental condition at the time of the rehearing, and determine whether secure confinement remains warranted (*see Matter of Barber v Rochester Psychiatric Ctr.,* 250 AD2d 87 [1998]; *Mat-*

*ter of Daniel R. v Wack,* 167 Misc 2d 74 [1995]; *Matter of Maureen A. v Wack,* 153 Misc 2d 600 [1991]). An acquittee who seeks a rehearing and review is entitled by Mental Hygiene Law § 9.35 to a jury trial on the issue of whether he or she is "mentally ill" as defined by CPL 330.20 (1) (d). However, the right to a jury trial does not extend to the issue of whether the acquittee suffers from a "dangerous mental disorder" because the right is given to allow an acquittee to challenge a finding that he or she is mentally ill requiring hospitalization (*see Matter of Barber v Rochester Psychiatric Ctr., supra,* relying upon *Matter of Maureen A. v Wack, supra* at 605). "No such right [to a jury trial] is given by the statute with respect to * * * dangerousness; for dangerousness is only an issue once deprivation of liberty—hospitalization—is authorized" (*Matter of Barber v Rochester Psychiatric Ctr., supra* at 90; *see Matter of Maureen A. v Wack, supra* at 605).

Norman D. argues that since the rehearing and review proceeding is intended to ascertain an insanity acquittee's mental state at the time it is conducted, the Supreme Court erred in limiting the scope of its review to whether the evidence adduced at the initial commitment hearing supported the July 1998 determination of the County Court that he was suffering from a dangerous mental disorder. He further maintains that since it is undisputed that he was no longer suffering from a dangerous mental disorder in 2001 when the Supreme Court conducted the rehearing and review proceeding, his "track status" should, in essence, be changed to track two, and he should be treated in the same manner as an acquittee initially found to be mentally ill, but not dangerous.

Turning first to the question of whether the Supreme Court improperly limited the scope of the proceeding, we note that it essentially conducted an appellate-type review by examining the transcript of the initial commitment hearing to determine whether the County Court's finding that Norman D. suffered from a dangerous mental disorder was supported by the evidence. We agree that the Supreme Court should not have conducted its review in this manner because the purpose of the rehearing and review proceeding is to ascertain the acquittee's mental condition at the time it is conducted. Thus, the rehearing and review must include consideration of the most recent evidence of the acquittee's condition which is available at the time of rehearing (*see Matter of Alphonse P. v Palmer,* 262 AD2d 490 [1999]). Basing the rehearing and review determination upon the acquittee's mental condition at the time of the

rehearing also serves an important due process function, since it affords an acquittee committed to a secure facility the opportunity for prompt judicial review of whether his or her condition has improved to such a degree that the acquittee is no longer dangerous and in need of secure confinement. Indeed, it has been observed that limiting a rehearing and review proceeding solely to an examination of the acquittee's condition at the time the original commitment order was made "might well be constitutionally infirm for no patient may be kept confined unless mandated by his time-of-trial condition" (*Matter of Maureen A. v Wack, supra* at 603). We further note that undue delay in conducting the proceeding, such as the approximately three-year delay which took place at bar, is to be avoided because it substantially erodes the right to rehearing and review.

However, we reject Norman D.'s contention that an acquittee who is no longer dangerous at the time the rehearing and review proceeding is conducted should be treated, in all future proceedings, as if he had been found to be mentally ill, but not dangerous, at the initial commitment hearing (track two). The statutory scheme for the treatment of insanity acquittees set forth in CPL 330.20 requires that an acquittee be assigned to one of three alternative tracks, "with different treatment progressions and procedural consequences" (*People v Stone, supra* at 300), shortly after he or she is absolved of criminal responsibility for a crime by reason of mental disease or defect. It is this initial denomination of track status, made close in time to a verdict or plea, which determines the level of supervision for all future proceedings (*see Matter of George L.,* 85 NY2d 295, 302 [1995]). Thus, an acquittee who suffers from a dangerous mental disorder at the time of the initial commitment order is placed under the "continued, direct oversight" of CPL 330.20 (*see Matter of David B.,* 97 NY2d 267, 277 [2002]), and is subject to its requirements that judicial approval be obtained for transfers, conditional releases, furloughs, and discharges, and that the district attorney receive notice of future proceedings (*see* CPL 330.20 [8]-[14]). This allows a greater degree of control to be maintained over the future treatment of an acquittee who poses a danger to his or herself or others at the time of the initial commitment, and promotes the statutory goal of protecting "the public from persons found not responsible of a crime by reason of mental disease or defect" (*Matter of Oswald N.,* 87 NY2d 98, 104 [1995]). As previously noted, an acquittee assigned track one status may seek permis-

sion to appeal to an intermediate appellate court (*see* CPL 330.20 [21] [a] [ii]), which has the power to modify the acquittee's track status if the evidence presented at the initial commitment hearing does not support a finding of dangerousness. However, the rehearing and review proceeding, which affords the acquittee a right to a jury trial on the issue of whether he or she currently suffers from a mental illness, is not designed as a substitute for appellate review of the initial commitment order. Rather, such a proceeding is intended to afford the acquittee a review of his status, and the need for retention, as of the time it is conducted (*see Matter of Maureen A. v Wack, supra,* at 603). In view of the purpose and function of the rehearing and review proceeding, we conclude that it may not be used as a vehicle to modify the track status established by the initial commitment order. Accordingly, while a court may determine, based upon evidence presented at the rehearing and review proceeding, that an acquittee is no longer in need of retention in a secure facility, such a finding does not change the acquittee's track status, and, in the absence of appellate modification of track status, all future proceedings regarding the acquittee's status continue to be governed by CPL 330.20. Thus, that portion of the order which determined that, despite the improvement in his condition, Norman D. remained subject to the provisions of CPL 330.20, is affirmed, without costs or disbursements.

FEUERSTEIN, J.P., MASTRO and RIVERA, JJ., concur.

Ordered that the order is affirmed insofar as appealed from, without costs or disbursements.