[773 NYS2d 356]

In the Matter of RICHARD H., Respondent, v EILEEN CONSILVIO, as Director of Kirby Forensic Psychiatric Center, et al., Appellants.

First Department, March 4, 2004

## APPEARANCES OF COUNSEL

*Marvin Bernstein, Director, Mental Hygiene Legal Service, First Department (Diane G. Temkin* of counsel), for respondent.

*Eliot Spitzer, Attorney General (Amy L. Abramowitz* and *Edward J. Curtis, Jr.* of counsel), for Eileen Consilvio, appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Ellen Sue Handman* and *Morrie I. Kleinbart* of counsel), appellant pro se.

## OPINION OF THE COURT

MAZZARELLI, J.

At age 20, petitioner Richard H. was diagnosed with paranoid schizophrenia. He is now 39 and has been involuntarily committed to various psychiatric institutions for 19 years. His first commitment, in 1984, resulted from an arrest for a series of bank robberies and attempted bank robberies. At each bank, petitioner had handed the teller a note demanding money, and threatened that he had either a gun or a bomb. Apparently, he did have a toy gun, but never displayed it or used any other violence in connection with the robberies. After his arrest, petitioner explained that he had committed the crimes because his former employer owed him money, which he was seeking to recover by robbing banks. He also thought that people would kill him if he did not steal the money. Richard H. pleaded guilty to second-degree attempted robbery, and was paroled pending sentence. While on parole, he resumed his attempts to rob banks and was rearrested. In June 1984, after a Criminal Procedure

Law article 730 examination, he was found unfit to stand trial and was committed to Mid-Hudson Psychiatric Center (Mid-Hudson). In January 1985, petitioner entered a plea of not responsible by reason of mental disease or defect (CPL 220.15) and was committed to the custody of the Commissioner of Mental Health (the Commissioner) pending further proceedings pursuant to CPL 330.20.

In February 1985, as required by CPL 330.20 (6), the court held a hearing and concluded that petitioner was suffering from a dangerous mental disorder under CPL 330.20 (1) (c). Petitioner was ordered retained at Mid-Hudson, a secure psychiatric facility. In October 1985, he was transferred to Kirby Forensic Psychiatric Center (Kirby), also a secure facility, where he remained for approximately three years after the issuance of several CPL 330.20 (9) retention orders.

After a 1988 retention hearing, petitioner was deemed no longer dangerously mentally ill and was transferred to Kingsboro Psychiatric Center (Kingsboro), a nonsecure civil psychiatric facility. Within less than a year, he absconded four times. During his last escape, petitioner was arrested for attempting to commit more bank robberies. This time, he told investigators that he was seeking compensation for head injuries inflicted by police officers in the early 1980s. Petitioner again entered a plea of not responsible by reason of mental disease or defect (CPL 220.15) and, on September 10, 1990, following another CPL 330.20 (6) hearing, he was ordered recommitted to Kirby. A succession of retention orders has since been issued (see CPL 330.20 [9]), one of which was granted on consent. During this period, the Commissioner also defended a number of the retention orders against petitioner's applications for nonjury rehearing and review (CPL 330.20 [16]). Petitioner remains at Kirby.

This appeal arises from the Commissioner's most recent (July 2002) application for a retention order. After holding a hearing, the court granted the Commissioner's application, finding that petitioner continued to suffer from a dangerous mental disorder, and ordered him retained in a secure psychiatric facility for 18 months. Petitioner sought rehearing and review of this determination under CPL 330.20 (16), and a different court held a hearing before a jury.

Petitioner was represented by Mental Health Legal Services at the hearing. The Attorney General appeared on behalf of the Commissioner and respondent Consilvio, Director of Kirby. The District Attorney also appeared in support of the respondent

Commissioner. Petitioner's treating doctors did not testify. Instead, the Director of Psychiatry at Kirby, Dr. James Hicks, testified for the Commissioner. Dr. Hicks supervised petitioner's treating doctors and had personally examined Richard H. four times. He had also reviewed petitioner's records, which included observations made by other doctors, nurses, aides and social workers. Dr. Hicks opined that petitioner had suffered from paranoid schizophrenia for more than 20 years, that he had antisocial personality traits and was only borderline functioning. He described Richard H.'s symptoms as including persistent delusions[1] and lack of insight which led him to commit the bank robberies. Further, Dr. Hicks explained that schizophrenia is "generally not curable" but that it can be treated with medication to a point where some people have no symptoms at all.

Dr. Hicks reviewed petitioner's criminal history. He also noted that Richard H. had been treated for several behavioral disorders. He stated that petitioner had been transferred to a nonsecure facility in 1988 when antipsychotic medications had taken effect, but that he had left that facility many times without permission. Dr. Hicks explained that since 1989, Richard H. has been treated with two different types of medications. One type was antipsychotic tranquilizers such as Haldol, Mellaril or Thorazine. These treated his hallucinations, delusions and disorganized thinking. The other type was mood stabilizers such as Lithium and Valproic Acid. These were used to dampen petitioner's schizophrenic symptoms of grandiosity and agitation. Dr. Hicks testified that when Richard H. refused to take his medications, he became delusional, claiming that people owed him money. Richard H., Dr. Hicks said, always improved when he resumed taking his medications and became relatively stable, but that he would stop taking his medications and his symptoms would then resume. Dr. Hicks also advised that in 1989 and 1997, it had been necessary to obtain court orders to administer medications over petitioner's objection.

According to Dr. Hicks, petitioner began refusing to eat in 2002, because he thought his food was being poisoned, and lost approximately 40 pounds. Petitioner was then given Risperidone, another antipsychotic drug, which lessened his delusions about his food and allowed him to gain weight. However, in May 2003, Dr. Hicks said that petitioner again refused to eat because

---

[1]. Dr. Hicks explained that delusions are fixed false beliefs that are not amenable to logical discussion.

he believed that someone had been tampering with his food. The doctor testified that petitioner had expressed a similar delusion only a month before this hearing.

Dr. Hicks opined that Richard H. had not improved enough to warrant a transfer to a nonsecure facility because he had a profound lack of insight into his mental illness, as well as delusional thinking and antisocial personality traits. Dr. Hicks concluded that because petitioner had been dangerous in the past, the fact that he still lacks insight about his illness and his need for medication predisposed him to repeat his former behavior if transferred to a nonsecure facility.

Next, Dr. Daniel Capruso testified on behalf of petitioner. Dr. Capruso is a psychologist and member of the Kirby Forensic Committee who had interviewed and evaluated petitioner three times. He had testified at some of Richard H.'s prior retention hearings. Initially, Dr. Capruso read petitioner's psychiatric history into the record and stated that petitioner was not dangerous because of a dramatic and substantial improvement in his condition during the prior year. He also testified that petitioner's treating doctors did not find him to be dangerous. However, as Dr. Capruso continued to testify, he acknowledged that Richard H. did pose some risk of harm, mostly to himself and, remotely, to others. Dr. Capruso said that for petitioner, "dangerous behavior" meant that he could place himself in situations where he could be hurt because of his delusions about food and the possibility that he might resume attempting to rob banks. Ultimately, Dr. Capruso concluded that it was premature to authorize Richard H.'s transfer to a nonsecure facility. He opined that petitioner should be retained at Kirby for more than a year with his present medication to be sure that he was no longer dangerous. Eventually, Dr. Capruso said, petitioner could be transferred to a nonsecure facility.

Richard H. then testified on his own behalf. He admitted to being mentally ill and taking medication, but denied that he was dangerous. He stated that he would continue with his medication if he were not in the hospital, even though it had side effects, because it "help[s him] feel better so [he] can cure his mental illness." Richard H. discussed the attempted robberies and some of the negative things he did when first admitted to Kirby. He explained that he left Kingsboro because "[he] did not know the rules and regulations" and "[saw] other patients leav[ing and returning]." However, he testified that he would not leave now unless he received permission from the court,

since "it[']s up to the courts to give [him] privileges." He also stated that, if transferred to a nonsecure facility, he would attend groups, take his medication, and not try to escape or attempt to rob banks. He testified that he did not consider himself dangerous even when he committed the attempted bank robberies because he only carried a toy gun.

The Attorney General moved for a directed verdict, based upon the fact that there was no controversy that petitioner was mentally ill. The District Attorney joined the motion. Over objection, the court reserved decision and submitted the issues of mental illness and dangerousness to the jury for an advisory opinion. The jury found that petitioner had a mental illness requiring inpatient care, but that petitioner did not constitute a physical danger to himself or others because of his mental condition.

The court agreed with the jury's assessment, and it ordered petitioner transferred to a nonsecure facility. The court credited petitioner's testimony, stating that it "felt very strongly, listening to the evidence in this case, that this man is not at all dangerous." The court noted that petitioner had shown tremendous progress since being placed on Risperidone in 2002, that he displayed insight into his illness, and that he acknowledged the importance of taking his medication. The court noted that Dr. Hicks's conclusions about petitioner's dangerousness were "almost entirely based upon robberies that were committed 20 years ago and 14 years ago back in the 80s." The court found Dr. Capruso's testimony more compelling than that of Dr. Hicks, especially his testimony that none of the petitioner's treating team would testify as to his dangerousness. Finally, the court recounted that the jury did not think that petitioner was dangerous, and it credited its advisory opinion as to this issue. It also recognized that even though petitioner would be transferred to a nonsecure facility, he would still be under restraint and have to meet certain conditions to earn any privileges. This appeal ensued.

CPL 330.20 governs state supervision over an insanity acquittee, such as petitioner, who has been found not guilty of a crime by reason of mental disease or defect pursuant to CPL 220.15. Following the entry of the plea, CPL 330.20 (6) requires the court to conduct an initial hearing to determine the insanity acquittee's current mental condition, and to classify the individual as either: (1) suffering from a dangerous mental disorder as defined in CPL 330.20 (1) (c); (2) suffering from a mental illness

pursuant to CPL 330.20 (1) (d); or (3) not mentally ill. The determination at the CPL 330.20 (6) hearing governs all of the insanity acquittee's future treatment under the CPL (*see Matter of David B.*, 97 NY2d 267, 276 n 4 [2002]). An insanity acquittee found to be dangerously mentally ill at the CPL 330.20 (6) hearing remains subject to oversight pursuant to the CPL, while an acquittee found mentally ill, but not dangerous, becomes subject to the relevant provisions of the Mental Hygiene Law.

Upon the court's conclusion that an acquittee suffers from a dangerous mental disorder, it must issue an order pursuant to CPL 330.20 (6), committing the acquittee to the Commissioner for confinement in a secure facility for six months from the date of the order (CPL 330.20 [1] [f]). Thereafter, CPL 330.20 (8) and (9) authorize the Commissioner to apply for retention orders. The statute also provides that an acquittee cannot be transferred, conditionally released, granted a community furlough, or discharged without court approval (*see* CPL 330.20 [8]-[14]).

When an application for a retention order is made, the court may hold a hearing, at which the Commissioner bears the burden of proving by a preponderance of the evidence that secure retention is necessary (*People v Escobar*, 61 NY2d 431 [1984]). However, the court "must conduct such hearing if a demand therefor is made by the district attorney, the [acquittee], counsel for the [acquittee], or the mental hygiene legal service" (CPL 330.20 [8]). While the Commissioner is represented by the Attorney General, the District Attorney also has a right to appear at the retention hearing and present evidence, as it did in this case (*id.*). If the court finds that the acquittee is still suffering from a dangerous mental disorder, it must order retention in a secure facility. Should the court find the acquittee mentally ill, but not dangerous, he or she must be transferred to a nonsecure facility pursuant to CPL 330.20 (11).

As relevant to the order appealed, CPL 330.20 (16) provides that an individual who is dissatisfied with an order of commitment or retention may obtain a rehearing and review under Mental Hygiene Law § 9.35. That section provides:

"If a person who has been denied release or whose retention, continued retention, or transfer and continued retention has been authorized pursuant to this article . . . be dissatisfied with any such order he may, within thirty days after the making of

any such order, obtain a rehearing and a review of the proceedings already had and of such order upon a petition to a justice of the supreme court other than the judge or justice presiding over the court making such order. Such justice shall cause a jury to be summoned and shall try the question of the mental illness and the need for retention of the patient so authorized to be retained. . . . If the verdict of the jury . . . be that such person is not mentally ill or is not in need of retention the justice shall forthwith discharge him, but if the verdict of the jury . . . be that such person is mentally ill and in need of retention the justice shall certify that fact and make an order authorizing continued retention under the original order."

Thus, the jury determines whether an insanity acquittee can be involuntarily committed to a psychiatric hospital based upon a finding that he or she is currently "mentally ill" as defined by Mental Hygiene Law § 1.03 (20).[2] There is no specific provision in the statute for a jury determination of the issues of "dangerous mental disorder" and the need for retention in a secure facility or transfer to a nonsecure facility. This has been interpreted to mean that those issues are excluded from the jury's province (*Matter of Barber v Rochester Psychiatric Ctr.*, 250 AD2d 87, 90-91 [1998]; *see also Matter of Norman D.*, 309 AD2d 143 [2003], *lv granted* 1 NY3d 503 [2003]; *Matter of Watkins R. v Berry*, 276 AD2d 492 [2000]). Thus, while an insanity acquittee does not have a right to a jury trial on the issue of dangerousness, the court may consider a jury's determination as to this issue in an advisory capacity (*Barber, supra* at 90). At the termination of the CPL 330.20 hearing, the court may decide to continue the acquittee's retention, to order a transfer to a nonsecure facility, or to release the acquittee.

On this appeal, both the District Attorney and the Attorney General have submitted briefs urging reversal. The District Attorney argues that since there was no dispute that petitioner was mentally ill, the rehearing and review pursuant to CPL 330.20 (16) should not have been conducted, and alternatively, that petitioner should be retained at a secure facility. The District Attorney asserts that no fair interpretation of the evi-

---

2. This provision defines a person as mentally ill who suffers from a mental disease or condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that he needs care, treatment and rehabilitation.

dence supports the determination that petitioner does not have a dangerous mental disorder. The Attorney General joins in the District Attorney's latter argument.

We reject the contention that because petitioner admitted that he was mentally ill, the jury's review and rehearing should not have been conducted. Regardless of the petitioner's own assessment, or a court's or doctor's opinion as to his mental health, he is entitled, under both the Federal and State Constitutions, to be provided with a jury trial on the question of involuntary commitment in a psychiatric hospital (*Baxstrom v Herold*, 383 US 107, 110 [1966]; *People v Lally*, 19 NY2d 27 [1966]; *Matter of Coates*, 9 NY2d 242, 249 [1961], *appeal dismissed* 368 US 34 [1961]). New York State has codified this right in Mental Hygiene Law § 9.35, which expressly provides that a patient who is dissatisfied with the hearing court's retention order can obtain jury rehearing and review by making a demand therefor within 30 days of the retention order. Petitioner did so here, and the court was thus required to conduct jury review and rehearing of the court's prior order (*see Matter of Watkins R. v Berry, supra*).

But we accept the argument that there is no fair interpretation of the evidence here which supports the determination that petitioner does not have a dangerous mental disorder. The jury made findings as to both mental illness and dangerousness, which the court considered to be advisory only on the question of dangerousness. Ultimately, the court agreed with the view of the jury on this issue, but only after its own independent review of the evidence (*see Barber, supra*). That assessment of the evidence and the court's order that the petitioner be transferred to a nonsecure facility were in error. Upon our review of the record, including the evidence elicited at the hearing, we find that the Commissioner established that petitioner suffers from a "dangerous mental disorder" as defined by CPL 330.20 (1) (c) (*see Matter of George L.*, 85 NY2d 295 [1995]; *Matter of Anonymous v Carmichael*, 284 AD2d 182 [2001]; *see generally Matter of Consilvio v Diana W.*, 269 AD2d 310 [2000]; *Matter of Arnold A. v Donaldson*, 215 AD2d 302 [1995]).

To retain an insanity acquittee in a secure facility, the Commissioner must show that the acquittee is mentally ill and that he poses a current threat to himself or others. He may meet this burden by presenting proof of a history of prior relapses into violent behavior, dangerous activities upon release, the necessity of medication to control the acquittee's violent tenden-

cies, and/or the likelihood that the individual would not comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance (*Matter of George L., supra* at 307-308).

Here, all of the witnesses, even petitioner himself, agreed that petitioner suffered from paranoid schizophrenia, and that he requires medication to control his psychosis and his delusional beliefs, which in turn affect his behavior. Further, petitioner's history is rife with incidents of dangerous behavior, including seven completed bank robberies, and 18 attempted bank robberies in which he threatened the use of a gun or a bomb. Regardless of whether petitioner actually possessed a bomb or whether he was carrying a real gun or a toy gun, his actions were dangerous to everyone in the banks, including himself. The witnesses at the hearing agreed that the motivation behind these crimes was petitioner's delusional belief that he was owed money by the city or his former employer. The Commissioner also presented ample evidence that petitioner placed his life at risk by refusing meals and becoming dangerously thin due to a delusional belief that someone was attempting to poison him. Finally, petitioner has a history of refusing to take his antipsychotic medication, and escaping when placed in a nonsecure facility. The record shows that twice it was necessary to obtain a court order to administer prescribed medication over petitioner's objection.

The remoteness in time of some of petitioner's dangerous behavior does not establish that he is no longer a danger. It must be remembered that since 1989 petitioner has been confined to the most structured, secure type of psychiatric facility available for an insanity acquittee, and has not been able to act as he wished (*see Matter of Francis S.*, 87 NY2d 554, 561 [1995] [current dangerousness was not established solely because petitioner's condition was stabilized during hospitalization]). Further, when placed in an unsecure facility, he repeatedly eloped. These escapes from Kingsboro support the conclusion that petitioner is currently dangerous. They show that "[petitioner's] behavior ha[s] already . . . frustrated the presumably reasonable expectations of mental health professionals" (*Matter of George L., supra* at 308).

Both Dr. Hicks and Dr. Capruso concluded that petitioner currently poses a danger to himself and others. Dr. Capruso, who was petitioner's witness, even stated that the short period of time during which petitioner had shown improvement was

insufficient to guarantee that he no longer posed a threat to himself or others. We agree with these doctors that although petitioner had shown progress since he began taking Risperidone, his brief improvement within the confines of a secure psychiatric institution does not establish that he no longer poses a danger to himself or others should he be placed in an nonsecure facility (*see Matter of George L., supra* at 305; *Matter of Francis S., supra*; *Matter of Ford*, 229 AD2d 319, 320 [1996]).

Accordingly, upon a finding that the petitioner still suffers from a dangerous mental disorder (CPL 330.20 [1] [c]), the orders of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered on or about June 17, 2003, which, after holding a hearing pursuant to Mental Hygiene Law § 9.35, directed that petitioner, an insanity acquittee, be transferred from a secure to a nonsecure mental health facility, should be modified, on the law and the facts, to the extent of granting the application for an order of retention in a secure facility, and otherwise affirmed, without costs

Motion seeking leave to dismiss point 1 of appellant District Attorney's brief denied.

NARDELLI, J.P., TOM and MARLOW, JJ., concur.

Orders, Supreme Court, New York County, entered on or about June 17, 2003, modified, on the law and the facts, to the extent of granting the application for an order of retention in a secure facility, and otherwise affirmed, without costs. Motion seeking leave to dismiss point 1 of appellant District Attorney's brief denied.