[790 NYS2d 94]

In the Matter of JAMIE R., Respondent, v EILEEN CONSILVIO, as Director of Kirby Forensic Psychiatric Center, Appellant.

First Department, February 24, 2005

### APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General*, New York City (*Julie M. Loughran* and *Robert H. Easton* of counsel), for appellant.

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Diane G. Temkin* of counsel), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

In July 1998, petitioner, charged with assault after kicking a court officer and attempting to kick a sergeant while in custody on a violation of probation and having been found to be suffering from paranoid schizophrenia and an antisocial personality disorder, pleaded not responsible by reason of mental disease and, following a hearing, was committed, pursuant to CPL 330.20 (7), to the custody of the Commissioner of the New York State Office of Mental Health and placed in the Hudson River Psychiatric Center, a nonsecure facility. Petitioner has been in and out of psychiatric and residential treatment facilities since 1987, and has a record of over 32 incidents involving criminal charges, including, inter alia, assault, weapons possession, aggravated harassment, criminal trespass, criminal contempt and criminal mischief. He has been convicted of a violent felony offense.

Petitioner was twice discharged from Hudson River on conditional release. Six days after his first release, he was readmitted following threats to kill his mother and fights with neighbors. On his second release, to a state-operated community residence, he was evicted after four months and sent to a crisis residence. Before his eviction, he was suspended from a treatment center for abusive language and disruptive behavior, alleg-

edly threw a chair during an altercation with a female resident and assaulted his girlfriend and was arrested for driving while intoxicated and operating a motor vehicle without a license. The Commissioner thereafter submitted an application for recommitment, pursuant to CPL 330.20 (14), seeking petitioner's confinement in a secure facility on the ground that he is suffering from a dangerous mental disorder.

While that application was pending, petitioner, discharged from the crisis residence to live with his mother, was rearrested on separate occasions for assaulting both his girlfriend and his mother. Returned to Hudson River in October 2002, he became involved in several incidents: threatening and shoving a patient suffering from multiple sclerosis, assaulting a psychotic and suicidal patient, pushing an elderly female patient, threatening and spitting at staff members, throwing plates and trays, threatening his girlfriend and refusing medications. A three-day hearing was held on the recommitment application in Supreme Court, Dutchess County, at the conclusion of which, on October 10, 2003, the court found that petitioner did, in fact, suffer from a dangerous mental disorder as defined in CPL 330.20 (1) (c). As required on such a finding (CPL 330.20 [14]), the court issued a recommitment order providing for six months of care and treatment in a secure facility (CPL 330.20 [1] [f]). That order has never been appealed. On October 20, 2003, petitioner was admitted to Kirby Forensic Psychiatric Center.

Thereafter, on November 6, 2003, petitioner moved in Supreme Court, New York County, pursuant to CPL 330.20 (16) and Mental Hygiene Law § 9.35, for rehearing and review by a jury of the October 10 recommitment order, naming the Kirby Center director as party respondent, and challenging the finding of Supreme Court, Dutchess County, that he was mentally ill.

Dr. Lawrence A. Siegel, board-certified in the fields of psychiatry and forensic psychiatry, was appointed by the court to examine petitioner to determine whether he suffered from a dangerous mental disorder. At the trial, he offered his diagnosis that petitioner had an antisocial personality disorder and impulse control disorder NOS (not otherwise specified). Dr. Siegel cited petitioner's antisocial personality disorder as the most important of his diagnoses and concluded that he suffered from a dangerous mental disorder, which required confinement in a secure facility.

Respondent also called Dr. Kishor Malavade, an attending psychiatrist at Kirby and a Fellow in Psychiatry and the Law at

New York University Medical Center, who found that petitioner suffered from a dangerous mental disorder and required continued care and treatment in a secure facility, an opinion which, he testified, petitioner's entire "treatment team" shared. In Dr. Malavade's opinion, petitioner suffers from antisocial personality disorder with narcissistic traits, which subsumes his impulse control problems. Both Drs. Siegel and Malavade testified that petitioner lacks insight into his condition, lacks remorse and, when not in a secure facility, has a history of noncompliance with treatment.

Petitioner, relying on his own testimony, in which he neither denied nor acknowledged that he suffered from a mental illness, and the testimony of his mother, offered no psychiatric evidence to rebut the conclusion offered by respondent's expert witnesses that he suffered from a dangerous mental disorder and required treatment in a secure facility. He testified that he hoped to live with his mother despite their troubled relationship, and expected to work for his brother, whom he did not remember threatening with a knife. He added that he had always been compliant in taking medication, a fact confirmed by his mother.

After both sides rested and respondent unsuccessfully moved for a directed verdict, the matter was sent to the jury with three questions:

> "[1] Does [petitioner] suffer from a mental disease or condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that he requires care, treatment and rehabilitation? [Definition of '(m)ental illness,' Mental Hygiene Law § 1.03 (20).]

> "[2] Does [petitioner] currently constitute a physical danger to himself or others because of his mental condition? [Definition of '(d)angerous mental disorder,' CPL 330.20 (1) (c).]

> "[3] Does [petitioner] suffer from a mental illness for which care and treatment as an in-patient of a psychiatric facility is essential to his welfare, and is his judgment so impaired that he is unable to understand the need for such care and treatment? [Definition of '(m)entally ill,' CPL 330.20 (1) (d).]"

The jury answered questions one and three in the affirmative, finding unanimously that petitioner was mentally ill and required continued retention as an inpatient at a psychiatric fa-

cility. By a five-to-one vote, however, the jury gave a negative answer to question two, in effect concluding that petitioner did not suffer from a dangerous mental disorder that required retention in a secure facility.

Concluding that the jury's finding that petitioner did not suffer from a dangerous mental disorder was advisory only, and that the ultimate decision as to "dangerousness" was the court's responsibility alone, the trial judge discounted the testimony of the two psychiatrists because their conclusions were based largely on hearsay. Instead, the court credited the testimony of another doctor, who had testified at the October 2003 recommitment hearing but not at the March 2004 trial for rehearing and review, and had expressed the opinion that petitioner was not dangerous. The court also found it significant that petitioner had not been physically abusive during his periods of hospitalization over the preceding 18 months. Finding the issue to be a "close question," the court held that petitioner did not suffer from a dangerous mental disorder requiring his continued retention in a secure facility.

The court memorialized this determination in a March 29, 2004 order prepared by petitioner's counsel, confirming the jury's finding that petitioner was mentally ill and its advisory opinion that he does not have a dangerous mental disorder, as the term is defined in CPL 330.20 (1) (c), and determining that he did not require confinement in a secure facility. The order further stated that the October 10, 2003 recommitment order issued by Supreme Court, Dutchess County, remained in effect. Petitioner thereafter moved successfully to resettle the March 29 order, resulting in the resettled order on appeal, which differs from the original by omitting reference to the jury's finding of mental illness, referring instead to the jury's "finding" that petitioner does not have a dangerous mental disorder, rather than to its "advisory opinion" to that effect. The resettled order also purported to deny the Commissioner's application for recommitment, in effect overturning the October 2003 recommitment order issued in Dutchess County. This Court granted respondent's application for leave to appeal the resettled order and for a stay pending appeal, the effect of which is to continue petitioner's confinement at Kirby. We now reverse.

Once the recommitment order was granted, petitioner was afforded the right either to appeal the recommitment order (CPL 330.20 [21] [a] [ii]) or to seek rehearing and review thereof in accordance with Mental Hygiene Law § 9.35 (CPL 330.20 [16]),

which requires a trial on "the question of the mental illness and the need for retention of the patient."[1] He chose to pursue the latter course. In his petition for rehearing and review, he alleged that he was not mentally ill and did not require retention at Kirby, a secure facility. Since petitioner does not, on this appeal, challenge the jury's determinations that he is mentally ill and requires retention as an inpatient at a mental health facility (CPL 330.20 [1] [d]), the only issue before this Court is Supreme Court's determination, adopting the jury's "finding"—which the court initially characterized as only an advisory opinion—that petitioner, although mentally ill and in need of inpatient care, did not suffer from a dangerous mental disorder requiring retention in a secure facility.

In our view, the court was not authorized to review the determination as to dangerous mental disorder. An insanity acquittee has a right to de novo review and a jury trial on the issues of mental illness and retention, but not on dangerous mental disorder (*Matter of Watkins R. v Berry*, 276 AD2d 492, 493 [2000]). "There is no specific provision in the statute for a jury determination of the issues of 'dangerous mental disorder' and the need for retention in a secure facility or transfer to a nonsecure facility. This has been interpreted to mean that those issues are excluded from the jury's province" (*Matter of Richard H. v Consilvio*, 6 AD3d 7, 14 [2004], *lv denied* 3 NY3d 601 [2004]). As to the proposition that an insanity acquittee does not have a right to a jury trial on the issue of whether he or she is suffering from a dangerous mental disorder, we go one step further and conclude that Mental Hygiene Law § 9.35 does not provide for a retrial on the question of a dangerous mental disorder by either the jury or the court. In so ruling, we disagree with those decisions concluding that while an insanity acquittee is not entitled to a jury trial on the issue of dangerous mental disorder, that question is one for the court to decide (*see e.g. Matter of James M. v Consilvio*, 6 AD3d 153 [2004]; *Matter of Barber v Rochester Psychiatric Ctr.*, 250 AD2d 87 [1998]; *Matter of Daniel R. v Wack*, 167 Misc 2d 74 [1995]).

---

1. Whether an individual has a mental illness as defined in Mental Hygiene Law § 1.03 (20) poses a separate question from the need for confinement in a psychiatric institution. "Mentally ill," as used in CPL 330.20 (1) (d), contemplates a defendant who both suffers from a mental illness and requires inpatient psychiatric treatment (*see Matter of David B.*, 97 NY2d 267, 277 [2002]). On the other hand, "[m]ental illness" under the Mental Hygiene Law definition does not include a finding that the individual requires inpatient psychiatric care.

Any analysis of the scope of the rehearing and review process must begin with the statutory authorization for such a proceeding. The plain language of the statute mandates the conclusion that rehearing and review does not include consideration of the issue of dangerous mental disorder. After a trial on the question of mental illness, one of two dispositions is required: "If the verdict of the jury . . . be that such person is not mentally ill or is not in need of retention the justice shall forthwith discharge him, but if the verdict of the jury . . . be that such person is mentally ill and in need of retention the justice shall certify that fact and make an order authorizing continued retention under the original order" (Mental Hygiene Law § 9.35). Thus, after the jury returned a verdict that petitioner was mentally ill and in need of treatment as an inpatient in a psychiatric facility, the court was required to authorize his continued retention under the original recommitment order, which had found a dangerous mental disorder and committed him to the custody of the Commissioner of Mental Health for confinement in a secure facility. Since continued retention under the recommitment order, which in turn requires confinement in a secure facility, is mandated by the statute, there would be no purpose served by permitting the court that conducted the rehearing and review to decide the question of whether the mentally ill individual suffers from a dangerous mental disorder.

Moreover, permitting the rehearing and review court to revisit the question of dangerous mental disorder would allow a court to sit in review of a court of coordinate jurisdiction, thereby violating a fundamental principle of law (*Forbush v Forbush*, 115 AD2d 335, 336 [1985]). While this rule may be overcome when there is express statutory authority, the statute at issue contains no such provision. Constitutional concerns of due process requiring jury review when a person's liberty interest is at stake are satisfied when the jury decides whether the person is mentally ill and in need of confinement in a psychiatric facility (*Matter of Robert C. v Wack,* 167 Misc 2d 677, 684 [1995]; *see also Matter of Daniel R. v Wack, supra,* 167 Misc 2d at 78). This liberty interest is the only interest protected by Mental Hygiene Law § 9.35. Since "dangerousness is only an issue once deprivation of liberty—hospitalization—is authorized," the right to a trial by jury does not attach to the determination of whether the individual is suffering from a dangerous mental disorder (*Matter of Maureen A. v Wack,* 153 Misc 2d 600, 604 [1991]). "This is no different than it should be. A principal, although

not the only, reason for detention of a person who is dangerously mentally ill in a secure facility is the protection of the public. This is uniquely a matter of judicial judgment and not a jury question. Once the initial question of deprivation of liberty—forced hospitalization—has been determined by the jury adversely to the patient's wishes, dangerousness and the type of confinement is for the court" (*id.* at 604-605).[2]

Moreover, a rehearing and review pursuant to CPL 330.20 (16) is a de novo proceeding, entirely separate and distinct from a recommitment hearing (*see Matter of Norman D.,* 309 AD2d 143, 148 [2003], *affd* 3 NY3d 150 [2004]). Unlike an appellate proceeding, which reviews the record on appeal for error, a rehearing and review seeks to ascertain an insanity acquittee's mental condition at the time the rehearing and review is conducted (*id.*; *see also Matter of Maureen A. v Wack, supra,* 153 Misc 2d 600 [1991]). Such a proceeding determines whether the insanity acquittee is mentally ill. Said simply, rehearing and review under CPL 330.20 (16) is not a substitute for appellate review of a recommitment order (*Matter of Norman D., supra,* 3 NY3d at 153-154).

This result does not leave an insanity acquittee who wishes to challenge a finding that he or she has a dangerous mental disorder without a remedy. He or she may appeal from the recommitment order (*see* CPL 330.20 [21]). Thus, the rehearing and review process here should have concluded with the jury's determination that petitioner was mentally ill and required continued retention as an inpatient at a psychiatric facility.

If the court's determination that petitioner did not suffer from a dangerous mental disorder were properly before us, we would reach a contrary conclusion. We note at the outset that this Court's power to review the factual findings reached in a nonjury trial is "as broad as that of the trial court," and we may render the judgment we find warranted by the facts (*Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492, 499 [1983]). Where "no fair interpretation of the evidence" supports them, a trial court's findings are not entitled to any deference and should be rejected (*Matter of Allen v Black,*

---

**2.** Some confusion may result from use of the word "dangerousness." There is a "constitutionally required element of dangerousness to oneself or others" subsumed in the definition of "[m]entally ill" under CPL 330.20 (1) (d) (*Matter of David B., supra,* 97 NY2d at 277). This is to be distinguished, however, from the dangerousness requirement as it applies to the definition of a "[d]angerous mental disorder" under CPL 330.20 (1) (c) (*id.* at 276-278).

275 AD2d 207, 209 [2000]; *see also Matter of Richard H. v Consilvio, supra,* 6 AD3d at 15). This is such a case.

Supreme Court erred in disregarding the uncontroverted testimony of the psychiatrists, Drs. Siegel and Malavade, both of whom testified that petitioner suffered from a dangerous mental disorder and required retention in a secure facility. In disregarding their opinions as based almost entirely on hearsay, the trial court ignored their testimony that they had examined petitioner personally and had administered tests, surely a form of evidence based on personal knowledge. To the extent that the two testifying psychiatrists relied on out-of-court statements and materials, the court ignored the well-established principle permitting consideration by an expert of "material not in evidence, provided the data relied upon [are] of the kind ordinarily accepted by experts in the field" (*People v Sugden,* 35 NY2d 453, 459 [1974]). As they explained, both experts based their opinions on a review of various records, and such review was important in forming an opinion.

Dr. Malavade, for example, testified that he reviewed and relied on petitioner's records from Kirby, as well as those from past hospitalizations and outpatient treatment (including psychiatric records dating back to when petitioner was nine years old), reports by an examining psychiatrist who evaluated petitioner prior to the October 2003 recommitment hearing and his criminal record. As Dr. Malavade explained, a patient's psychiatric and treatment history is relevant to current care and treatment and the number of his arrests, as opposed to convictions alone, reveals "a pattern of behavior" and informs psychiatric opinion.

Similarly, Dr. Siegel testified that he relied on petitioner's arrest reports and history, hospital records describing his behavior, history of treatment at nonsecure facilities and efforts to prepare petitioner for community living, employment and relationship history. These records, together with Dr. Siegel's communications with petitioner, his mother, his girlfriend and a psychiatrist involved in the October 2003 recommitment hearing, informed his opinion that petitioner suffered from a dangerous mental disorder, for which commitment to the care of a secure facility was required.

Not only did Supreme Court erroneously discount the psychiatrists' opinions as based in part on hearsay, but it compounded that error by itself relying on what is indisputably hearsay, namely, that one doctor testified at the October 2003

Dutchess County recommitment hearing that he opposed petitioner's commitment to a secure facility. As the court noted,

> "There was apparently an October hearing, and it came out at trial that at that hearing there was a doctor who testified and found [petitioner] not to be dangerous. I don't know why that doctor was not here. I have no idea. The testimony I think is, as I said before, very close."

Of course, petitioner was free to call that witness, or any other witness, to rebut the testifying experts' conclusions that he suffered from a dangerous mental disorder.

Any fair and rational consideration of the uncontroverted testimony of Drs. Siegel and Malavade, even to the extent it could be tempered by the testimony of petitioner and his mother, leads to only one conclusion: that petitioner suffered from a dangerous mental disorder and required retention in a secure psychiatric facility. This Court has recognized that psychiatric findings, undisputed or uncontroverted, may constitute sufficient evidence to support a patient's retention (*see Matter of Consilvio v Diana W.*, 269 AD2d 310, 312 [2000]; *Matter of Arnold A. v Donaldson*, 215 AD2d 302, 304 [1995]).

The burden of showing that an insanity acquittee suffers from a dangerous mental disorder that requires his retention in a secure facility may be met by proof of a "history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment" or that he will otherwise not comply with directives for the taking of medication that is necessary to control his violent tendencies (*Matter of George L.*, 85 NY2d 295, 308 [1995]). Here, respondent presented detailed evidence that petitioner's mental illness manifested itself not only in acts of violence outside a secure facility, but also in physical and verbal outbursts even during secure detention. In addition to the assault that resulted in his insanity acquittal, the evidence showed that petitioner had, in the past, threatened his mother's life, assaulted his girlfriend, attempted to assault his brother with a knife, thrown chairs, attacked and harassed elderly and physically infirm patients, been arrested on numerous occasions due to violence or threats of violence and been involved in fights.

Dr. Malavade testified that petitioner had to be moved to different wards at Kirby as a result of his aggression and the other patients' resulting fear. He had been verbally hostile and he cursed at Kirby staff. Before his transfer to Kirby, he had spat

at Hudson River staff; his disruptive behavior there led to "Code Greens," in which the staff is called to restrain or medicate a patient. As Dr. Siegel testified, the hospital records were "replete with [petitioner] being violent, threatening, ignoring the rights of others," and his "assaultive, threatening behavior . . . has made it impossible for him to be maintained" at a non-secure facility. Of course, petitioner minimized all of this. Dr. Siegel testified that when petitioner was asked about hitting his girlfriend, he responded, "I left no marks. If you don't leave marks that's harassment. That's not assault."

Supreme Court also disregarded the unrebutted psychiatric testimony that petitioner lacked insight into his illness. Dr. Siegel testified that petitioner failed to accept responsibility for his actions and Dr. Malavade testified that despite petitioner's numerous hospitalizations, he stated that he does not have a mental illness and does not need medication. Dr. Malavade testified that before petitioner came to Kirby, during his last admission at Hudson River, he had stopped taking his medication. Dr. Siegel testified that petitioner failed to follow treatment recommendations. He had been dismissed from one treatment program for noncompliance. According to Dr. Siegel, during a period of extended home leave, treating personnel "had to basically threaten not to discharge him to get him to start following treatment recommendations. He was staying out late. He wasn't going to his treatment program. And basically, they had to threaten him in some way to get him to comply." This is significant because "[i]ndividuals who don't believe they have an illness," according to Dr. Malavade, "generally do not follow through with their treatment when it's on a voluntary basis."

In sum, no fair interpretation of the evidence can sustain Supreme Court's determination that petitioner does not have a dangerous mental disorder requiring his commitment to a secure facility for treatment and care.

In any event, since the jury found that petitioner was mentally ill, the court was statutorily required to issue an order authorizing petitioner's continued retention under the recommitment order of Supreme Court, Dutchess County (Mental Hygiene Law § 9.35). In that regard, its original March 29, 2004 order correctly stated that despite the finding that petitioner was not suffering from a dangerous mental disorder, the recommitment order remained in effect. The court did not have the power to deny the application for recommitment as it subsequently did in the resettled order on appeal and as petitioner requested in his motion to resettle the original order.

We have examined petitioner's other arguments and find that they are without merit.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered June 21, 2004, which, upon a jury determination that petitioner did not have a dangerous mental disorder, denied respondent's application for recommitment to a secure facility and directed that petitioner be transferred to a nonsecure facility, should be reversed, on the law and the facts, without costs or disbursements, the judgment vacated and, upon the jury determination of mental illness and need for treatment, the petition denied and petitioner's continued retention authorized pursuant to the order of Supreme Court, Dutchess County, entered on or October 10, 2003.

TOM, J.P., ANDRIAS, WILLIAMS and GONZALEZ, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered June 21, 2004, reversed, on the law and the facts, without costs or disbursements, the judgment vacated, the petition denied and petitioner's continued retention authorized.