[986 NYS2d 190]

In the Matter of MARVIN P., Respondent; KATHLEEN M. RICE et al., Appellants.

Second Department, May 21, 2014

**APPEARANCES OF COUNSEL**

*Kathleen M. Rice, District Attorney*, Mineola (*Tammy J. Smiley* and *Jacqueline Rosenblum* of counsel), appellant pro se.

*Eric T. Schneiderman, Attorney General*, New York City (*Cecelia C. Chang* and *Patrick J. Walsh* of counsel), for New York State Office of Mental Health, appellant.

*Marvin P.*, respondent pro se.

**OPINION OF THE COURT**

CHAMBERS, J.

The primary question before us is whether, pursuant to CPL 330.20 (1) (c), the respondent currently suffers from a dangerous mental disorder necessitating his continued retention in a secure psychiatric facility. Following a hearing, the Supreme Court determined that the respondent no longer suffered from a dangerous mental disorder and ordered his release upon an order of conditions. We disagree and reverse. In reaching our conclusion, we consider the significance of the respondent's refusal to submit to an evaluation by an Office of Mental Health psychologist to assess his present mental condition.

### Background

The Underlying Offense

On September 11, 1993, the respondent repeatedly stabbed his wife, Susan, as she slept, inflicting six stab wounds including a punctured lung. Susan survived. The respondent was charged with attempted murder in the second degree and a related offense. With the permission of the court and the consent

of the People, the respondent pleaded not responsible by reason of mental disease and became an insanity acquittee pursuant to CPL 220.15. As required, he submitted to a psychiatric examination and appeared for a hearing, after which the Supreme Court determined that he suffered from a dangerous mental disorder (see CPL 330.20 [1] [c]). Subsequently, the Supreme Court ordered his commitment to Kirby Forensic Psychiatric Center (hereinafter Kirby), a secure facility, for treatment (see CPL 330.20 [1] [b]; [6]).

### Initial Commitment Period

The respondent remained at Kirby for almost five years. While hospitalized, he was diagnosed with either bipolar disorder, on Axis I, or a personality disorder with a history of major depression, on Axis II, or some combination thereof. Clinicians reported that the respondent "was provocative, demanding, impulsive, disruptive and verbally abusive to staff and [other patients]." They noted his failure to comply with treatment and medication regimens and, as a result, Kirby was permitted to medicate him over his objection. They further noted his obsessive behaviors, including his preoccupation with his various lawsuits and his attempted sexual contact with female staff.[1]

### Release and Recommitment

Following a retention hearing on November 2, 1998, the Supreme Court ordered the respondent transferred to Middletown Psychiatric Center (hereinafter Middletown), a nonsecure

---

1. In a written report, Dr. Patricia Simon-Phelan, a psychologist who became familiar with the respondent when she was assigned to his ward at Kirby, wrote that he was consumed with his many lawsuits and, according to one psychiatrist, would spend the entire night awake reviewing his lawsuits without appearing tired. In Susan's divorce action against him, the respondent, proceeding pro se, made more than 50 motions. The presiding judge in the divorce action said that he had a "history of bombarding the Court with unnecessary" motions and frivolous applications. Simon-Phelan also noted the respondent's abusive and threatening behavior, including sexual advances he made towards female staff. For example, in 1997, the respondent wrote a disturbing and threatening letter to a female staff member. He wrote that he wanted her to bear his two children and that he did not "usually lose in the end." He would try his "damndest" to "prevail with blood gushing out of all orifices." Later, he gave that staff member a copy of The Count of Monte Cristo, a novel in which the protagonist, following his escape from prison, seeks revenge on those responsible for his wrongful imprisonment. In 2001, the respondent became enamored with a female therapy aide. He wrote her a romantic letter. After she refused his advances, he continued writing to her and expressed his dismay over her rejection. After the aide reported his letter-writing to her superiors, the respondent retaliated by accusing her of sexual misconduct. He claimed that she "conspicuously hugs clients, forcing her breasts into the client's chest (or other parts on occasion)."

facility, upon a finding that, while he was still mentally ill and in need of confinement (*see* CPL 330.20 [1] [d]), he did not constitute a physical danger to himself or others (*see* CPL 330.20 [1] [c]). In October 2003, the Supreme Court ordered the respondent released from Middletown with an order of conditions which included a court order of protection directing him to refrain from any contact with Susan, then his ex-wife. However, in January 2005, the respondent telephoned Susan and told her that he loved her and was miserable without her. She told him not to call her again. He persisted, calling her twice more, asking in his last phone call if she would meet him for dinner in Massachusetts. Susan contacted the police because she was "unnerved to an extreme degree," and the respondent was arrested on a charge of second-degree criminal contempt. As a result of this charge, he pleaded guilty and was sentenced to a definite term of incarceration of one year. While in jail, he was examined and found to be dangerously mentally ill and in need of treatment at a secure psychiatric facility. The examining psychiatrist noted that the respondent was highly litigious and grandiose, and minimized his past acts of violence. On August 12, 2005, the Commissioner of Mental Health (hereinafter the Commissioner) applied for and subsequently obtained a recommitment order, and the respondent has been confined under successive retention orders at Mid-Hudson Forensic Psychiatric Center (hereinafter Mid-Hudson), a secure psychiatric facility, ever since.

Applications for Retention

Prior to the filing of the instant application, the Commissioner filed four applications for further retention of the respondent at Mid-Hudson. The matters were repeatedly delayed, largely because the respondent, whose stated lifelong ambition is to become an attorney, discharged multiple attorneys and insisted on representing himself. Each of his prior retention applications was supported by a forensic psychiatric report, authored by a psychiatrist or a psychologist, concluding that the respondent was dangerously mentally ill. Although the respondent challenged the applications for further retention, he refused to allow the Commissioner's examiners to interview him for their forensic psychiatric reports to the court on his mental condition. Nonetheless, the forensic reports reflected that the respondent had no insight concerning his mental illness, refused to participate in treatment, made threats of violence against staff members and patients, assaulted others,

and was verbally abusive toward patients, often provoking altercations.

Retention Hearing

### The Appellants' Case

The instant application for the continued retention of the respondent was filed by the Commissioner on September 22, 2011. At the hearing on the application, the appellants presented Simon-Phelan's 35-page forensic report, along with her testimony and the testimony of Dr. Peter Formica. Initially, Simon-Phelan and Formica noted that the respondent refused to be interviewed on multiple occasions, just as he had during each of the four previous applications filed by the Commissioner. In reaching their conclusions, they relied on their observations of, and interactions with, the respondent, along with their review of a multitude of documents, including the uniform case record, various psychiatric examination reports spanning a 20-year period, police reports, and court records.

Simon-Phelan and Formica both concluded that the respondent is mentally ill. They agreed that the respondent is suffering from bipolar disorder on Axis I. Simon-Phelan explained that bipolar disorder is a mental illness characterized by episodes of mania, followed by depression. The respondent tends to be more manic; in fact, it is his natural state. When so, the respondent cannot control his emotions and, he has excessive energy, pressured speech, disorganized thoughts, and a flight of ideas. The respondent enjoys this state, feeling that it makes him more productive. However, he has reached the point where he is delusional. His mania manifests itself in excessive, overzealous litigation. He spends countless hours with his approximately 10 cases. For example, in September 2011 alone, he asked the Mid-Hudson librarian to make 50,000 copies of his paper work. He has sent numerous faxes to various judges and has called the "commissioner of quality of care" repeatedly. Formica stated that the respondent's mania surrounding his litigation is a defense, a way to avoid depression.

In addition, on Axis II, the respondent suffers from a severe personality disorder. According to Simon-Phelan, the respondent suffers from narcissistic and grandiose personality disorders. According to Formica, the respondent suffers from an antisocial personality disorder with narcissistic features and a personality disorder not otherwise specified. The respondent's refusal to listen to rules, excessive use of the telephone and computer, inflated ego, propensity for lying, lack of remorse,

cursing, threats, and use of ethnic and racial slurs, all support the diagnoses. Simon-Phelan's report includes examples of his "provocative, offensive, [and] aggressive behaviors" toward other patients and staff such as the following: in October 2006, he held a pen to another patient's throat, for which he was placed on one-to-one supervision; during the period from May to July 2007, he threw a cup of water at a staff member, knocked a cup of coffee out of a staff member's hand, spit at a patient, and scratched another patient while trying to take his food; in September 2009, he put blue markings on his body with a pen in an attempt to falsely accuse staff members of having beat him, and he abused his telephone privileges; also in 2009, when the respondent made a threatening remark to another patient, he was placed on one-to-one monitoring for several months and, then, following an assault on another patient, he was placed on one-to-three supervision. The year 2011 "brought more of the same," as the respondent monopolized the phone, argued with staff over the use of pens, and verbally abused both patients and staff by cursing at them and using racial slurs. Similarly, progress notes from the four months preceding the hearing recount instances where, for example, he confronted a staff member about a television, struggled with another staff member over a remote control, threatened to expose himself if he was not given a pen, and smacked another patient because the patient was too close to his legal papers. The respondent antagonized some of the other patients to the point where they wanted to strike him.

Further, Simon-Phelan and Formica concluded that the respondent is a danger to himself and to others. Prior to January 2011, before Formica became the respondent's treating psychiatrist, the respondent had taken small doses of psychiatric medication and responded well. Since then, however, the respondent has refused to take any psychiatric medication. The respondent was medicated only on an emergency basis when he became extremely agitated, eight times in 2011, and three times in 2012. Formica attributed the decrease in psychiatric medication to the fact that the respondent was taking medication for hypothyroidism, which is also used to treat mania. Formica stated that, as a result of the respondent's refusal to take medication, he has no or very poor insight into his mental illness. Indeed, the respondent has denied that he has an active mental illness. Likewise, the respondent has no insight into the underlying incident. He denies that he stabbed Susan, and has

offered to prove that she stabbed herself. According to Simon-Phelan, the respondent is angry about being detained and is still angry with Susan, who had taken from him, a former millionaire, everything that he had worked so hard to earn. Until the respondent started taking medication and gained insight into his mental illness, Susan remained "at great risk for further harm." Formica opined that the respondent, if released, would try to repeat the offense. The respondent is also a danger to himself. He likes to engage in risky behavior by, for example, taunting the most dangerous patient at Mid-Hudson, which he does because he feels entitled to do so or believes that there will not be any consequence for it. Formica explained that people who are manic like to engage in dangerous behavior because it gives them a feeling of exhilaration. In short, considering factors demonstrative of a dangerous individual, such as a history of refusing to participate in treatment and to take prescribed medication, violent behavior, and lack of insight and impulse control, the respondent is dangerously mentally ill.

### The Respondent's Case

The respondent presented the testimony of Allison Conner, a psychologist, and Quazi Al-Tariq, a psychiatrist.

### Allison Conner's Testimony

Allison Conner, whose 37-page report was entered into evidence, testified as follows: Conner became acquainted with the respondent in January 1995, when she was at Kirby. Between September 1998 and July 1999, she was his treating psychologist. While under her treatment, the respondent was consistent in mood and behavior, acting rationally and logically. In 1999, Conner left Kirby and entered private practice.

In 2003, following the respondent's release, Conner treated him on an outpatient basis. She found him to be vigilant in caring for his psychiatric issues. He communicated with her regularly, sought medication, and even voluntarily checked himself into a hospital when he felt anxious. She noted in her report, however, that the respondent never told her that he planned to contact Susan, and that later, the respondent told her that he had not violated the order of protection because Susan had waived it. Following his recommitment, Conner did not communicate with him again until July 2009.

At that time, the respondent retained Conner as an examiner and witness for the instant hearing. Over the next three years, they were in contact almost daily, largely by telephone. She dis-

agreed with the appellants' experts' diagnoses of bipolar disorder and, in fact, concluded that he is not mentally ill at all. Rather, he has only personality traits of personality disorders. It was only those examiners with "cursory" or "superficial" knowledge of the respondent who concluded that he was bipolar. Indeed, although Simon-Phelan's report stated to the contrary, those who had the most contact with the respondent while he was at Kirby had offered a diagnosis of major depressive disorder with psychotic features, single episode, and his diagnosis was changed to bipolar disorder nearly a decade after the underlying offense. It is unlikely that a high-functioning individual such as the respondent with no prior psychiatric issues would suddenly develop bipolar disorder in his 60s. There is no real connection between mania and litigiousness, although the respondent is "overzealous" in his legal matters. He writes because there is nothing else for him to do. Although progress notes indicate that he is "bothersome" and violates Mid-Hudson rules and regulations, the violations are never specified. Although it was said that he threatens staff, the only threats he made were to sue and write legal complaints. Further, there is a notable absence of evidence in the progress notes of an unstable mood. It seems that he is simply "annoying and irritating to staff, causing them to dislike him." He is angry at being detained for seven years after making a nonthreatening phone call, and when his "buttons [are] pushed," he pushes back. His behavior in this regard is completely predictable. When he feels his rights are being violated, he protests loudly and provocatively with his voice and pen, because those are his only tools. When he speaks with Conner, he is "courteous, composed and goal-directed." She attributes his "loudness" to him being from New York and Jewish, just as she is. He is, she testified, "quite normal" for someone who is from New York and Jewish.

When questioned about the instances where the respondent had allegedly held a pen to a patient's throat, punched another patient, spit on a patient, threw water at an aide, and claimed to have physically abused his first wife, Conner said the first instance was "very questionable," the second "self defense," the third and fourth accidental, and the fifth fabricated so that there would be a basis for their divorce, which Conner characterized as an "act of chivalry." Conner denied that she had lost all objectivity and was simply accepting the respondent's word for everything, despite the fact that she had no way of confirming the veracity of the respondent's explanations. To the contrary, she said, her opinion of him had remained the same since 1999.

In addition to concluding that the respondent is not mentally ill, Conner opined that he is not dangerous. He is now 74 years old, and has medical conditions, including heart disease. The underlying offense, his memory of which is incomplete, was a single episode and the result of anxiety and major depressive disorders brought about by stress, which conditions are now in full remission. At the time of the underlying offense, the respondent was overleveraged. The Internal Revenue Service (hereinafter the IRS) was auditing him. He felt financially vulnerable and feared losing everything he had, including his home. His anxiety increased and he experienced severe insomnia over at least six months. He became paranoid, fearing that the IRS was pruning his trees in order to spy on him. He planned to kill himself, but he was unable to do so. After the underlying offense, he "decompensated quite quickly." Now he has insight into why he "decompensated." Indeed, when released, he sought psychiatric help because he was feeling anxious and did not want to "decompensate" again. He is not going to pursue Susan if released. He has "no ambiguity" surrounding her, no hope of reconciling with her as he had in the past, and no desire or reason to contact her. Although the underlying offense had resulted in the respondent losing his fortune as well as his liberty, he had no animosity toward her. Conner was "impressed" with his "forgiving attitude" toward Susan. The relationship was over, and he had moved on. To that end, if released, the respondent planned to write an autobiography or movie script, return to his former career as a United States Treasury agent, or study law under an attorney in Vermont in the hope of sitting for the New York State bar examination.

Quazi Al-Tariq's Testimony

Al-Tariq testified as follows: He treated the respondent between September and December 2010 while at Mid-Hudson. In preparation for the instant hearing, he examined the respondent for 1½ hours and spent about another 1½ hours reviewing his medical records, which were contained in seven or eight two-inch-thick binders. Like Conner, he concluded that the respondent has no disorder on Axis I, and only personality traits of personality disorders on Axis II, which do not require medication or hospitalization, only some counseling. Some of his symptomatology overlaps with bipolar disorder, but he is not bipolar. If the respondent were truly bipolar, he would not be able to function in court without being medicated, as he was doing. When provoked, he would become upset or angry. He

becomes so when he cannot control his environment, because he does not want his things moved. However, any normal person would be upset by these circumstances. He has very high self-esteem, which others view as delusional.

Further, the respondent is not dangerous. He has not threatened anyone. The calls he placed to Susan were not threatening. They were a way of reconciling, and "he paid the price" for violating the order of protection. Al-Tariq noted that Susan had asked to dismiss the charges related to the respondent's underlying offense, and that Susan and the respondent had lived together while the respondent was out on bail. The underlying offense itself was attributable to stress. The respondent did not threaten staff or patients at Mid-Hudson, and other patients intimidated him over minor issues regarding phone calls and returning pens. In addition, his medical conditions limit him physically.

On cross-examination, Al-Tariq acknowledged that he had been found guilty by an arbitrator of multiple instances of double-billing and was terminated from his employment with Mid-Hudson. Also, in June 2009, Al-Tariq had concurred in a forensic report finding the respondent dangerously mentally ill. Al-Tariq explained that when the forensic committee meets, its determination must be unanimous, even if some of its members disagree. He stated that the committee simply follows the directions of the District Attorney's Office as to whether an individual should be released.

The Order Appealed From

In a written order, the Supreme Court concluded that the appellants had not proven that the respondent is dangerously mentally ill and, thus, denied the appellants' application for his continued retention and directed that he be released subject to an order of conditions to be prepared by the Commissioner. This Court granted the appellants' motion for leave to appeal from the order and to stay enforcement of the order pending hearing and determination of the appeals. We now reverse.

Analysis

Initially, in reviewing a determination such as this, made after a hearing (see CPL 330.20 [9]), this Court's authority is as broad as that of the Supreme Court (see Matter of Amir F., 94 AD3d 1209, 1212 [2012]). Our factual review power permits us to render the determination warranted by the facts, making our own findings of fact when necessary, while bearing in mind that

in a close case, the Supreme Court had the advantage of seeing and hearing the witnesses (*see Matter of George L.*, 85 NY2d 295, 305 [1995]; *Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]; *Matter of Jeremiah S. [New York State Commr. of Mental Health]*, 69 AD3d 730, 732 [2010]; *see also Matter of Thomas G.*, 50 AD3d 1139, 1140 [2008]). In this instance, we cannot defer to the Supreme Court's determination and are compelled to make our own findings of fact (*see Matter of Hogue [Seltzer]*, 187 AD2d 230, 237 [1993]; *cf. People v Rodriguez*, 77 AD3d 280, 284 [2010]). Despite the significant conflicts in the psychiatric testimony, the Supreme Court made almost no findings of fact (*see Matter of Carpinello v Floyd A.*, 23 AD3d 179, 182 [2005]).

Moreover, the Supreme Court's four-page order includes only a summary of the evidence, its observation that the respondent conducted himself well during the two-day hearing, and an implicit finding that the respondent's witnesses were more credible. Based on some of the comments in the *order*, the Supreme Court justified its determination in part on facts that were irrelevant—that the respondent had spent more time detained for violating the order of protection by calling Susan than he did for stabbing her, and that Susan did not want the respondent to be prosecuted for the underlying offense of attempted murder.[2] Further, the Supreme Court seemed to place too much emphasis on facts that had only a minimal bearing on its determination, such as that the respondent did not threaten Susan during his telephone calls to her. Left with only these few comments, we must conclude that the Supreme Court did not make the appropriate inquiry: whether the respondent suffers from a "dangerous mental disorder or is mentally ill" (CPL 330.20 [9]; *see Matter of George L.*, 85 NY2d at 302; *Matter of Rabinowitz v James M.*, 50 AD3d 451 [2008]).

---

**2.** It is for this very reason that the New York State Unified Court System instituted specialized domestic violence courts so that felony domestic violence cases are brought before judges who have been trained in the dynamics of domestic violence and therefore know that domestic violence victims often drop charges for reasons that have nothing to do with the severity of the charge or the veracity of the complaint (*see* Robert Wolf, *Principles of Problem Solving Justice* at 3 [2007], available at http://www.courtinnovation.org/sites/default/files/Principles.pdf [accessed Mar. 17, 2014]; Judith S. Kaye & Susan K. Knipps, *Judicial Responses to Domestic Violence: The Case for a Problem Solving Approach*, 27 W St U L Rev 1, 4 [2000] [noting that in domestic violence cases, the victims often have compelling reasons, such as fear, economic dependence, or affection, for feeling ambivalent about cooperating with the legal process]).

This appeal calls upon us to apply settled law to unique facts. For the reasons set forth below, we conclude that the appellants demonstrated by a fair preponderance of the evidence that the respondent is mentally ill as statutorily defined and that he currently constitutes a physical danger to himself or others (*see Matter of Arto ZZ.*, 24 AD3d 947, 948 [2005]; *Matter of Richard S.*, 208 AD2d 750, 751 [1994]; Jerome Prince, Richardson on Evidence § 3-206 [Farrell 11th ed 2008]).

Mental Hygiene Law § 1.03 (20) defines a mental illness as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation."

Upon our review of the record, we find that the credible evidence established that the respondent suffers from a mental illness, the first element of a dangerous mental disorder (*see* CPL 330.20 [1] [c]). Simon-Phelan and Formica opined that the respondent suffers from bipolar disorder, along with various personality disorders, whether narcissistic, grandiose, or antisocial. Most relevant, the respondent's behaviors, consistently displayed over the past 20 years, as thoroughly documented throughout the record, are indicative of these disorders. These behaviors include his aggressive and violent acts, his abrasiveness when speaking to others, his refusal to follow rules, his inappropriate sexual advances, his inflated self-esteem, his high level of energy, his excessive writing, and his overzealousness with respect to litigation (*see Matter of Mental Hygiene Legal Servs. ex rel. James U. v Rhodes*, 195 AD2d 160, 162 [1994]). Although the categorization of the respondent's mental illness has differed between mental health professionals, a number of professionals have drawn the same conclusions as Simon-Phelan and Formica, dating back as far as 1994. As one psychiatrist put it in 2003, the debate about whether the respondent's "pathology is Axis I or Axis II or some combination thereof . . . can be carried on indefinitely," but when one considers his symptomatic exacerbation, poor judgment, and poor impulse control, all of which continue to exist, he remains in "the category of dangerously mentally ill."

In *Matter of George L.* (85 NY2d at 308), the Court of Appeals outlined the factors justifying an insanity acquittee's retention in a secure facility. The prosecution may meet its burden

"by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control defendant's violent tendencies and that defendant is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance" (*id.*).

In *Matter of David B.* (97 NY2d 267, 279 [2002]), the Court of Appeals added that, in considering the level of dangerousness an insanity acquittee must exhibit in order to be detained in a nonsecure facility, a court may also consider

"the nature of the conduct that resulted in the initial commitment, the likelihood of relapse or a cure, history of substance or alcohol abuse, the effects of medication, the likelihood that the patient will discontinue medication without supervision, the length of confinement and treatment, the lapse of time since the underlying criminal acts and any other relevant factors that form a part of an insanity acquittee's psychological profile."

Between the two determinations, confinement in a secure facility, as opposed to a nonsecure facility, there is an overlap of factors (*see id.*). The difference in dangerousness is a matter of degree; confinement in a secure facility requires that the insanity acquittee's dangerousness be more pronounced (*see id.* at 278-279). Consideration of these factors here warrants a finding that the respondent's dangerousness is pronounced and, thus, he must be retained in a secure facility.

In assessing the respondent's dangerousness, we note as a threshold matter that the respondent's refusal to be formally interviewed by the appellants' mental health professionals does not inure to his benefit. "Having refused to submit to a new psychological evaluation, [the respondent] may not now rely on the absence of a more current psychiatric evaluation to support his contention that the [appellants] failed to prove that he" is dangerously mentally ill (*Matter of State of New York v Jason H.*, 82 AD3d 778, 780 [2011]; *see also Ughetto v Acrish*, 130 AD2d 12, 21 [1987]). A proceeding such as this is civil in nature (*see Matter of Oliver C. v Weissman*, 203 AD2d 458, 459 [1994]). The respondent's refusal to submit to an examination of his current medical condition is comparable to a party's failure to

appear for a deposition or an independent medical examination (*see Matter of State of New York v Jason H.*, 82 AD3d at 780; *Matusewicz v Jo Jo's Auto Parts, Inc.*, 18 AD3d 828, 829 [2005]). In that context, a sanction would be appropriate. While the respondent cannot be sanctioned under these circumstances, his failure to cooperate does not render the appellants' proof in this case insufficient. In any event, as Formica testified during the hearing, the lack of a formal interview did not preclude him from reaching a reliable diagnosis. A more complete assessment might have been made had the respondent agreed to be interviewed, to the extent he was willing to refrain from lying and manipulating the facts, as he has in the past. However, as Formica explained, a reliable diagnosis could be made based on his interactions with and observations of the respondent.

We turn next to the respondent's attempted murder of Susan, the act that led to his initial commitment pursuant to CPL 330.20. Although the underlying offense was committed nearly 20 years ago, it was extremely violent (*see Matter of George L.*, 85 NY2d at 306; *Matter of Carpinello v Floyd A.*, 23 AD3d at 182-183; *see also Matter of Commissioner of Off. of Mental Health v Glenn B.*, 44 AD3d 517, 518 [2007]). The respondent does not take responsibility for stabbing Susan (*see Matter of Rabinowitz v James M.*, 50 AD3d at 452; *Matter of Carpinello v Floyd A.*, 23 AD3d at 183). Rather, he denies stabbing her, as Formica recounted in his testimony. The respondent's filings with this Court reflect the same. The first necessary step toward rehabilitation, which goes to the very heart of CPL 330.20, cannot be taken until the respondent acknowledges that he stabbed his wife and expresses his sincere regret (*see generally Matter of Silmon v Travis*, 95 NY2d 470, 477 [2000] [noting that rehabilitation may be given effect by considering remorse and insight]; *Matter of Umer K.*, 257 AD2d 195, 196 [1999] ["The first step toward rehabilitation is a sincere admission of the wrongdoing"]). Such an acknowledgment would demonstrate a level of insight into his mental illnesses, that they make him prone to violence, and that he has to be vigilant, both in monitoring the things that trigger negative behavior and in taking medication. Yet, like his refusal to take responsibility for the act that led to his commitment, the respondent does not acknowledge that he even has an active mental illness (*see Matter of Carpinello v Floyd A.*, 23 AD3d at 183; *Matter of Jamie R. v Consilvio*, 17 AD3d 52, 62 [2005], *affd* 6 NY3d 138 [2006]). Rather, he believes that he had a one-time mental breakdown brought on by stress.

The respondent does not participate in treatment and he refuses to take any psychiatric medication, despite evidence that small doses of medication, such as the medication used to treat his hypothyroidism, are effective in treating his illnesses (*see Matter of Rabinowitz v James M.*, 50 AD3d at 452). CPL 330.20 contemplates a progression through treatment. Yet, the respondent has not progressed at all because he refuses all treatment (*see* Mental Hygiene Law § 1.03 [20]; *cf. Matter of Arto ZZ.*, 24 AD3d 947 [2005]). Indeed, the respondent believes that his mania makes him more productive. That may be the case, but, it also makes him more dangerous. As Formica stated, the respondent has not taken steps to "mitigate [his] dangerousness." Stated differently, until the respondent starts undergoing treatment, it has to be assumed that he is just as dangerous today as he was the day he returned to Mid-Hudson. He was dangerous when he was first recommitted to Mid-Hudson, and he has not treated that dangerousness in any way since his recommitment (*see generally Matter of Ferry v Goord*, 268 AD2d 720 [2000]). As a consequence of the respondent's lack of insight and refusal to participate in treatment, it is unlikely that he will comply with any future medical treatment, even if directed, whether in a secure or nonsecure facility, or as a condition of an order of release (*see* CPL 330.20).

In addition, the record is replete with instances where the respondent has relapsed into violent behavior. After he was released on bail pending trial in 1994, he lived with Susan. During that time, among other disturbing conduct, he carried knives in his briefcase, and threatened to cut off her breasts and shove a sharp object into her buttocks. At one point, the respondent and Susan had an argument and he physically restrained her. The Nassau County District Attorney's Office was contacted, and they sought to hold him in custody.[3]

The dissent implicitly considers it of no moment that, in this case, the respondent violated an order of protection. Although the respondent's attempts to contact Susan on the telephone in 2005 could, in isolation, be viewed as harmless or innocent, they reflect his continuing fixation on her that cannot simply be dismissed as innocuous. While his words were nonthreatening, i.e., he professed his love for her, told her he was miserable without her, and asked her to have dinner with him at a partic-

---

**3.** In his brief, the respondent states that he had to restrain Susan because she was having an "explosive mood swing" brought on by "Premenstrual Dysphoric Disorder."

ular restaurant in Massachusetts, these unwanted phone calls were made in violation of an order of protection and his conditions of release, and "[o]bviously . . . [they] must be viewed in the context of the prior relationship that existed between [them]" (*People v Brown*, 61 AD3d 1007, 1009 [2009]). When so viewed, the fact that the respondent's words themselves were not overtly threatening provides no assurance that he does not pose a danger to Susan. Despite Susan's entreaties not to call her again after the first call, he persisted in calling her two more times before she contacted the police. Indeed, Susan's decision to contact the police in order to have the respondent arrested for violating the order of protection because, as she said, the calls "unnerved [her] to an extreme degree," demonstrated that she herself feared for her physical safety—a fear that was well justified in light of the respondent's manipulative nature and past history of physical violence.[4]

Since his recommitment, the respondent has also relapsed into violent conduct. He has held a pen to another patient's neck, and punched, smacked, and spit at other patients. When he does not get his way or is directed to comply with Mid-Hudson rules, he is combative, curses, and uses ethnic and racial slurs. In the four months leading up to the hearing, the respondent struggled with a staff member over a remote control, threatened to expose himself if he was not given a pen, and hit another patient because the patient was too close to his legal papers. On several occasions the respondent became so agitated that Formica had to forcibly medicate him over his objection. The respondent also places himself at risk of injury by antagonizing dangerous patients, which, according to Formica, he does because he finds it exhilarating (*see Matter of Richard H. v Consilvio*, 6 AD3d 7, 16 [2004]). The respondent is so dangerous,

---

**4.** Commentators have noted that there is a growing body of research that documents "the profound use of nonviolent manners" by which abusers control and threaten their victims, such as harassing phone calls (Joanne Belknap, Ann T. Chu & Ann P. DePrince, *The Roles of Phones and Computers in Threatening and Abusing Women Victims of Male Intimate Partner Abuse*, 19 Duke J Gender L & Pol'y 373, 377 [spring 2012]), and have observed that abusers frequently use telephone calls to apologize and woo their victims back, and to threaten and seek revenge against them (*id*. at 378, 385). Former Chief Judge Judith S. Kaye, for example, observed that perpetrators of domestic violence present a particularly high risk for continuing, even escalating, violence against complainants as they seek further control over their choices and actions (*see* Judith S. Kaye & Susan K. Knipps, *Judicial Responses to Domestic Violence: The Case for a Problem Solving Approach*, 27 W St U L Rev 1, 4 [2000]).

both to others and to himself, that in the most secure psychiatric facility in New York State he has been placed at various times on one-to-one or even one-to-three monitoring. Clearly, the record supports the inference that the respondent's disruptive behavior would continue and escalate absent interruption by his monitors and the repeated emergency administration of medication for extreme agitation (*see Matter of George L.*, 85 NY2d at 304).

The evidence the respondent presented to show that he does not suffer from a mental illness and is not dangerous was simply not credible. Al-Tariq concurred in a June 2009 forensic report, finding that the respondent was dangerously mentally ill. It was only after Al-Tariq was terminated from Mid-Hudson for dishonesty that he changed his opinion. Al-Tariq explained that the committee had to be unanimous in its report and, in any event, it simply followed the directions of the District Attorney's Office. However, the record reflects that, at other times, the committee has not reached a unanimous decision on whether the respondent was dangerously mentally ill. Moreover, if, as Al-Tariq claims, he simply deferred to the District Attorney, such deference shows a serious ethical lapse and belies his current concern over the respondent's liberty interest. To that point, Al-Tariq's feeling that the respondent had "paid the price" for violating the order of protection had no place in his assessment. CPL 330.20 proceedings are not concerned with punishment, but treatment and the protection of society (*see Jones v United States*, 463 US 354, 369 [1983]). Al-Tariq's assessment that the respondent is not dangerous because he did not threaten Susan when he called her in January 2005 was shortsighted, as he failed to recognize that, in cases of domestic violence, offenders frequently engage in escalating courses of conduct (*see People v Cajigas*, 19 NY3d 697, 702 [2012]). In any event, as previously explained, Susan found the calls threatening, which was how any objectively reasonable person would have viewed them. Al-Tariq did not mention any of the respondent's disturbing conduct in 1994 when he was released on bail and, concomitantly, did not express how it bore on his assessment of the respondent's dangerousness. Al-Tariq also failed to consider that Susan may not have wanted the respondent prosecuted and allowed him to live with her for reasons that had nothing to do with her assessment of his dangerousness, reasons that may even have been irrational (*see* Alexandria Zylstra, *Mediation and Domestic Violence: A Practical Screening Method for Media-*

*tors and Mediation Program Administrators,* 2001 J Disp Resol 253, 255-256).[5]

Al-Tariq testified that the respondent becomes angry and upset when provoked, just as any person would. However, the respondent's reactions are anything but normal. Spitting, hitting, and using racial and ethnic slurs when one does not get his way are not normal reactions. Also, although not willing to diagnose him as bipolar, Al-Tariq had to acknowledge that some of the symptoms he observed, such as the respondent's very high self-esteem, are symptoms of bipolar disorder and narcissistic personality disorder.

Conner's assessment displayed a lack of objectivity. Conner accepted every innocent explanation the respondent offered for his conduct. She did so without the benefit of hearing from those involved in the subject incidents, such as the respondent's first wife or Susan, and without any basis for evaluating the veracity of his explanations. The general tone of her report reflects that she has adopted the respondent's belief, expressed throughout his brief, that Mid-Hudson and the Nassau County District Attorney's Office are conspiring to keep him detained by fabricating progress notes and suppressing relevant evidence. Her unusually close relationship with the respondent, as evidenced by her nearly daily telephone contact with him, may be the explanation for her markedly one-sided point of view.

In addition, some of the comments she made during her testimony alone call into question the soundness of her judgment. Her comment that the respondent has forgiven Susan, despite the fact that she was the one stabbed, was, to say the least, odd. It reflects again that she has adopted the respondent's point of view without giving any consideration to how he has manipulated the facts to portray himself as a victim. Like the respondent, Conner does not appreciate how the stabbing and the respondent's violation of the order of protection have affected Susan. Conner's remark that the respondent's behavior simply reflects that he is a typical "New York Jew" was intemperate and unprofessional. A misguided stereotype is no explanation for his atypical behavior.

Some of Conner's conclusions are contradicted by the record. For example, her report states that while the respondent was at Kirby between 1995 and 2001, his diagnosis by all of his examin-

---

**5.** One doctor described the respondent's relationship with Susan as "pathological."

ers, with the exception of a single doctor, was major depressive disorder with psychotic features, single episode, and mixed personality disorder with narcissistic and histrionic features. However, Simon-Phelan recounted in her forensic report that during the respondent's commitment at Kirby, he had a diagnosis of bipolar disorder, and she identified five different doctors who diagnosed him with either bipolar disorder I or bipolar disorder II during the first three years of his commitment. Conner testified that there is no connection between mania and litigiousness, but, as Simon-Phelan testified, the respondent's mania manifests itself in excessive litigation, and Conner herself acknowledged that the respondent was overzealous in his legal matters.

Although the Supreme Court found that the respondent conducted himself in an orderly and respectful manner during the hearing (see Matter of Timothy M., 307 AD2d 295, 296 [2003]), bipolar disorder is episodic in nature. Moreover, Formica noted that, as is fairly typical of a person with bipolar disorder, the respondent is able to control himself over a short period of time, such as he did during this brief two-day hearing. In short, the evidence presented by the appellants was more persuasive.

In addition, we are not persuaded by the fact that the respondent would be subject to an order of conditions upon his release. His violation of the order of protection, and his violations of Mid-Hudson's rules that have continued unabated since his recommitment, make it unlikely that he will comply with an order of conditions. On these facts—a long history of volatile propensities toward other patients and staff, medication refusal and noncompliance, and repeated refusal to comply with treatment programs—we simply cannot conclude that the respondent should be placed in a nonsecure psychiatric facility.

We conclude that the respondent suffers from a dangerous mental disorder such that his retention in a secure psychiatric facility is warranted. Accordingly, the order is reversed, on the facts, and the application for the continued retention of the respondent is granted.

SKELOS, J. (concurring in part and dissenting in part). Upon the application for a subsequent retention order to continue the respondent's confinement in a secure psychiatric facility, the Supreme Court determined that the respondent neither had a "[d]angerous mental disorder" nor was "[m]entally ill" (CPL

330.20 [1] [c], [d]), and directed that the respondent be released upon an order of conditions. The majority concludes that, contrary to the Supreme Court's determination, the appellants met their burden of proving that the respondent had a "[d]angerous mental disorder" (CPL 330.20 [1] [c]), requiring his continued confinement in a secure psychiatric facility. We disagree and conclude, as a matter of law, that without regard to the case presented by the respondent, the appellants failed to make a prima facie showing that the respondent suffered from a "[d]angerous mental disorder" (*id.*). Instead, we find, contrary to the Supreme Court's determination, that the appellants demonstrated that the respondent was "[m]entally ill" (CPL 330.20 [1] [d]), such that a retention order should be issued, but that the respondent should be transferred to a nonsecure psychiatric facility. Therefore, we concur in part and dissent in part.

In 1994, the respondent entered a plea of not responsible by reason of mental disease or defect (*see* Penal Law § 40.15) to a charge of attempted murder in the second degree, which was based upon an incident in which he stabbed his then second wife, Susan. In 1995, after a hearing, and upon evaluations by two psychiatrists, who diagnosed the respondent with bipolar disorder, the respondent was found to have a "[d]angerous mental disorder" (CPL 330.20 [1] [c]), and was confined to Kirby Forensic Psychiatric Center (hereinafter Kirby), a secure facility (*see* CPL 330.20 [6], [1] [f]).

In June 2000, upon the recommendation of members of his treatment team at Kirby, as well as a forensic evaluation by a staff psychiatrist at Kirby and an independent forensic evaluation, both finding that the respondent was no longer dangerously mentally ill, the respondent was transferred to Middletown Psychiatric Center (hereinafter Middletown), a nonsecure facility.

While at that facility, it was noted that the respondent "would become agitated, loud, and confrontational when he perceived injustices against him or was asked to follow the ward procedures." However, it was specifically noted that the respondent "had not displayed any assaultive behavior." The types of problematic behaviors in which the respondent engaged at Middletown included shouting matches with patients over use of the computer, obsessive writing of letters and legal documents concerning perceived wrongs against him, using communal spaces as his private "office," writing letters to female staff members expressing romantic interest, forbidding patients

to use the telephone, making derogatory remarks to a patient, threatening to write up staff members and to get them suspended or have their licenses revoked, and only minimally participating in therapy. Based upon these behaviors, Middletown was granted permission, in 2002, to medicate the respondent over his objection. However, Middletown determined not to request permission to give the respondent antipsychotic medications, as opposed to mood stabilizers, since he showed "no clinical evidence of any overt psychotic symptoms."

In October 2003, upon an order of the Supreme Court, the respondent was released from Middletown with an order of conditions (see CPL 330.20 [12]). During that time, the respondent lived with his mother, participated in outpatient therapy, worked to restore his business, and, on one occasion, presented himself to a hospital for inpatient psychiatric care when he felt depressed. In February 2005, Susan reported to the police that she had received three telephone calls from the respondent (one of which was a voice-mail message), in violation of an order of protection. Susan reported that the respondent had told her that he loved her and asked her to go out to dinner with him. Upon a plea of guilty, the respondent was convicted of criminal contempt and sentenced to one year in jail. While in jail, the respondent was evaluated by a psychiatrist, who recommended inpatient hospitalization based upon the respondent's "continued litigiousness, his grandiosity, and his minimization of his past acts of violence." Four months later, the psychiatrist amended his report to indicate that the respondent was "dangerously mentally ill" and in need of treatment at a secure facility. In October 2005, the respondent was admitted to Mid-Hudson Forensic Psychiatric Center (hereinafter Mid-Hudson), a secure facility.

While confined at Mid-Hudson, the respondent refused to take medication, and questioned his psychiatric diagnosis. He also reportedly antagonized patients and made hurtful and inappropriate comments to them, made derogatory comments and was verbally abusive to staff, refused to comply with staff directives, "hoard[ed]" legal papers, refused to shower, threw a cup of water on a staff member, and knocked a cup of coffee out of a staff member's hand. In October 2006, the respondent placed a pen on a patient's throat, and the following month, punched a patient. A few days after that episode, Mid-Hudson made an application for authorization to medicate the respondent over his objection. The respondent was also medicated over his objection

a number of times in 2011 and 2012, "after displaying rapid, pressured speech, flight of ideas, and paranoid ideation," as well as unspecified "agitated" behavior. In applying to medicate the respondent over objection, the respondent's treating doctor indicated that he was "mainly afraid that [the respondent would] have another heart attack" from becoming so agitated.

On September 22, 2011, the present application was made for a subsequent retention order (see CPL 330.20 [9]), to continue the respondent's confinement at Mid-Hudson for a period not to exceed two years, based upon the view that the respondent continued to suffer from a "[d]angerous mental disorder" (CPL 330.20 [1] [c]). In support of the application, Mid-Hudson submitted forensic psychiatric reports authored by staff psychologist Patricia Simon-Phelan, and psychiatrist Michael H. Stone. Simon-Phelan and Stone both diagnosed the respondent with bipolar disorder and a personality disorder, and opined, based upon the history of the respondent's prior confinement, as detailed above, and his lack of insight into his illness and refusal to take medication, that the respondent had a "dangerous mental disorder."

A hearing was held on the application, at which Simon-Phelan testified that she believed that the respondent was a danger to others because it was her opinion that "he would try to harm" Susan. Simon-Phelan further opined that the respondent was a danger to himself because "[h]e aggravates other patients so much that if anyone were to hit him, then he would be in danger of having a stroke." Similarly, the respondent's treating psychiatrist, Peter Formica, when asked whether the respondent was a danger to himself and others, indicated that he was "a danger mainly to himself" because he provokes the other patients. Formica also predicted that the respondent would be a danger to Susan if he were released to the community.

In opposition, the respondent presented evidence from psychologist Allison Conner, who opined that the respondent did not suffer from bipolar disorder, and that he did not require any mental health treatment. The respondent further presented evidence from psychiatrist Quazi Al-Tariq, who agreed with Conner that the respondent was not bipolar, or "[m]entally ill" as that term is defined in CPL 330.20 (1) (d), although he acknowledged that he concurred in a report issued in June 2009, which found the respondent to be suffering from bipolar disorder and in need of continued confinement at that time.

The Supreme Court concluded that the respondent did not have a "[d]angerous mental disorder" and was not "[m]entally

ill" (CPL 330.20 [1] [c], [d]), such that he should be released upon an order of conditions (*see* CPL 330.20 [12]).

If, upon a hearing on an application for subsequent retention of a defendant in a secure facility, the court determines that the defendant has a "dangerous mental disorder," it must issue a subsequent retention order (CPL 330.20 [9]). "Dangerous mental disorder" means that "a defendant currently suffers from a 'mental illness' as that term is defined in [Mental Hygiene Law § 1.03 (20)]" and "that because of such condition he currently constitutes a physical danger to himself or others"* (CPL 330.20 [1] [c]; *see Matter of George L.*, 85 NY2d 295, 302 [1995]).

If, however, the court finds that the defendant is "mentally ill but does not have a dangerous mental disorder," it must issue a subsequent retention order, along with an order transferring the defendant to a nonsecure facility and an order of conditions for the transfer (CPL 330.20 [9]; *see* CPL 330.20 [11]; *Mental Hygiene Legal Servs. v Wack*, 148 AD2d 341, 343 [1989]). For purposes of CPL 330.20, "[m]entally ill" means

> "that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center . . . is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment" (CPL 330.20 [1] [d]).

Although not expressly stated in the statutory definition of "mentally ill," in order to satisfy due process concerns, "a constitutionally required minimum level of dangerousness to oneself or others . . . must be shown before an insanity acquittee may be retained in a non-secure facility" (*Matter of David B.*, 97 NY2d 267, 276 [2002]). However, "the concept of danger necessary to justify confinement in a nonsecure facility is not equivalent to the heightened dangerousness finding—dangerous mental disorder—that justifies placement in a secure facility" (*Matter of Jamie R. v Consilvio*, 6 NY3d 138, 152 n 12 [2006]). Rather, the Court of Appeals has held that "the criteria for mental illness" provided in CPL 330.20 (1) (d) "satisfy the

---

* "Mental illness" is defined in the Mental Hygiene Law as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation" (Mental Hygiene Law § 1.03 [20]).

constitutional requirement of 'dangerousness' " (*Matter of David B.*, 97 NY2d at 279). In other words, the findings that inpatient care is necessary and that the individual does not understand the need for such care are sufficient to satisfy the minimum level of dangerousness required to retain an individual in a nonsecure facility (*see id.*).

Here, although the appellants demonstrated that the respondent is "[m]entally ill" (CPL 330.20 [1] [d]), so as to warrant his retention in a nonsecure facility, they failed, as a matter of law, to meet their burden of demonstrating by a preponderance of the evidence (*see People v Escobar*, 61 NY2d 431 [1984]) that the respondent was suffering from a "[d]angerous mental disorder" (CPL 330.20 [1] [c]), so as to justify his continued confinement in a secure facility.

In *Matter of George L.* (85 NY2d 295 [1995]), the Court of Appeals discussed the showing necessary to support a finding of current dangerousness, so as to warrant retention in a secure facility. It explained:

> "[t]he prosecution may meet its burden of proving that a defendant poses a current threat to himself or others warranting confinement in a secure environment, for example, by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control defendant's violent tendencies and that defendant is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance" (*id.* at 308).

In that case, the appellant, who suffered from acute paranoid schizophrenia, was confined in a psychiatric hospital after having assaulted his father (*see id.* at 298). The appellant was subsequently released, upon the opinions of his doctors that he was compliant with his medications and had gained insight into his illness (*see id.*). However, only 10 days after his release, the appellant attacked his father with a hunting knife (*see id.* at 299). Seventeen months later, the appellant was found to be suffering from a "[d]angerous mental disorder" (CPL 330.20 [1] [c]). The Court of Appeals affirmed that finding, stressing "the peculiar circumstances of appellant's *relapse*" and the fact that his "behavior had already once frustrated the presumably rea-

sonable expectations of mental health professionals" (*Matter of George L.* at 308). Further, the Court indicated that the violent nature of the defendant's criminal act constituted significant evidence of his dangerousness because that act had occurred only 17 months earlier, and that the lack of any more recent violence was not particularly significant, since the appellant had been "tranquilized" and confined for the entire 17-month period following the crime (*id.* at 307).

In a similar vein, the Court of Appeals affirmed a finding that the appellant was suffering from a "dangerous mental disorder" in *Matter of Francis S.* (87 NY2d 554, 561 [1995]), based upon the appellant's "history of prior relapses into *violent* behavior and of recurrent substance abuse and noncompliance with treatment programs upon release" (*id.* at 561 [emphasis added]).

In contrast, the circumstances in the respondent's case do not support the heightened dangerousness finding required for retention in a secure facility. The only evidence of violent conduct offered by the appellants, other than the 1994 offense against Susan, was the respondent's acts, six years before the hearing, of holding a pen to a patient's throat and punching a patient, and five years before the hearing, of knocking a cup of coffee out of a staff member's hand. While there are vague references to "assault" in Simon-Phelan's psychiatric report, there is no description of, or other facts pertaining to, any specific assault committed by the respondent. Simon-Phelan's report is similarly vague as to the reason that the respondent was periodically placed on close supervision, indicating that he was placed on close supervision for "provocative behavior," for his own protection against assault by others, and once, simply, "for assault." In the same vein, although the respondent was reported to have "threatened" staff or patients, there is no indication that any of these threats were violent in nature, as opposed, for example, to threats of lawsuits or to staff members' employment status. Further, while applications to medicate the respondent over objection were made on a number of occasions, only one of those occasions—stemming from the incident, six years prior to the hearing, in which the respondent punched a patient—was related to any violent behavior on his part. Rather, the applications were made, in large part, due to the respondent's manifestation of typical, nonviolent bipolar symptoms and a concern by his treating doctor that his agitation would worsen his deteriorated medical condition.

Thus, we cannot agree with the majority's characterization of the appellants' evidence as being replete with examples of threats and physical acts of violence. The lack of evidence of any specific assaultive or violent conduct over a five-to-six-year period in which the respondent was not continuously medicated is significant to the question of the respondent's present dangerousness, unlike the lack of evidence of violent conduct in *Matter of George L.* during the relevant 17-month period in which George L. was "tranquilized" (*Matter of George L.*, 85 NY2d at 307). Moreover, while the respondent's underlying crime was undoubtedly extremely violent, it was committed 19 years prior to the hearing, and behavior of that nature was never repeated, even during the respondent's period of confinement in a nonsecure facility or during his release into the community.

As to the remainder of the respondent's behaviors while confined, it cannot be said that they indicate present dangerousness for purposes of confinement to a secure facility. As established by the record and as amply recited in the majority opinion, the respondent's mental illness manifests itself in excessive and overzealous litigiousness, annoying behaviors, verbal abuse, and socially offensive behavior such as use of racial or ethnic epithets. This conduct does not demonstrate that the respondent poses a physical threat to others.

Indeed, when specifically asked at the hearing why they believed that the respondent was a physical danger to himself or others, the appellants' experts, Simon-Phelan and Formica, only speculated that the respondent might harm Susan, and concluded that he was a danger to himself because he provoked other patients. Unlike a patient who, for example, is suicidal or prone to self-mutilation, the respondent's provocation of other patients does not show that he is a physical danger to himself. A concern that the respondent might anger and be hurt by other people simply does not justify "the significant limitations on [the respondent's] liberty interest which accompany secure confinement" (*Matter of George L.*, 85 NY2d at 308).

As to Simon-Phelan's and Formica's belief that the respondent would harm Susan, the Court of Appeals has made clear that "a finding that a defendant 'currently constitutes a physical danger to himself or others' must be based on more than expert speculation that he or she poses a risk of relapse or reverting to violent behavior once medical treatment and supervision are discontinued" (*id.* at 307-308, quoting CPL

330.20 [1] [c]). Although the respondent violated the order of protection issued in Susan's favor during his period of release into the community, he did not engage in any violent or threatening behavior toward her. In fact, he limited his contact with her to the telephone. The forensic psychiatric reports offered by the appellants do not contain evidence that the respondent expressed or harbored any intent to physically harm Susan. There is simply no reason to conclude, based upon the respondent's specific circumstances, including his conduct during the 19 years since the underlying offense, that the respondent's behavior with respect to Susan would escalate, or that the respondent, who is now 74 years old and, according to the appellants' proof, in poor physical health, would be a physical danger to her, if transferred to a nonsecure facility. Thus, any such conclusion would be mere speculation.

Accordingly, without considering the respondent's evidence, we conclude as a matter of law that the appellants failed to make a prima facie showing that the respondent "currently constitutes a physical danger to himself or others" (CPL 330.20 [1] [c]), thus requiring confinement in a secure facility (cf. Matter of Francis S., 87 NY2d at 561; Matter of George L., 85 NY2d at 308; Matter of Rabinowitz v James M., 50 AD3d 451, 452 [defendant properly found to have a " 'dangerous mental disorder' " where the defendant made threats of violence against staff members and patients of the facility, engaged in physical acts of violence, refused to participate in treatment, and was accused of forced sexual contact upon a fellow patient (quoting CPL 330.20 [1] [c])]; Matter of Carpinello v Floyd A., 23 AD3d 179 [2005] [defendant properly retained in a secure facility where, inter alia, while confined, he was involved in 15 violent incidents]; Matter of John P., 265 AD2d 559, 559 [1999] [petitioner showed that patient posed a substantial threat of physical harm to himself or others where evidence demonstrated that patient had "serious difficulty maintaining control of his rage and anger, and that he was frequently violent and verbally abusive"]).

Instead, contrary to the Supreme Court's conclusion, the evidence demonstrated that the respondent exhibited the minimum level of dangerousness to himself or others required to retain him in a nonsecure facility. In this respect, the opinions of the appellants' experts, the respondent's history, including the underlying offense, diagnoses of bipolar disorder since the early 1990s, and his documented behaviors while confined, as well as the respondent's refusal to take medication and denial

of any mental illness, demonstrate that the respondent is still in need of inpatient psychiatric care and that he is unable to understand the need for such treatment. The opinions of the respondent's experts—that he suffered from a single episode of depression at the time of the offense against Susan but was not otherwise mentally ill and did not require treatment—were not credible. Those opinions were belied by numerous psychiatric evaluations of the respondent performed by different psychiatrists and psychologists through the years, many of whom opined that the respondent suffered from bipolar disorder, and by the respondent's conduct while confined. That conduct and the respondent's history amply demonstrated that the respondent was not yet prepared to function in the community (*see Matter of Zheng Z.*, 78 AD3d 720, 721 [2010]; *Matter of Jerriell O.*, 288 AD2d 313, 314 [2001]).

We further note that, because the respondent was initially classified as having a "dangerous mental disorder," he would continue to be subject to the procedural restrictions in CPL 330.20 even upon his transfer to a nonsecure facility (*see Matter of Jamie R. v Consilvio*, 6 NY3d at 143; *Matter of Norman D.*, 3 NY3d 150, 152 [2004]; *Matter of Michael RR. [Commissioner of Mental Health]*, 233 AD2d 30, 34 [1997]). Thus, a court order would be required, for example, for any off-ground furlough, release, or discharge, and the District Attorney's Office would be notified of any further court proceedings, with the option of participating (*see* CPL 330.20 [10], [12], [13]; *Matter of Jamie R. v Consilvio*, 6 NY3d at 143; *Matter of Norman D.*, 3 NY3d at 154-155).

Accordingly, we would reverse the order and remit the matter for a finding that the respondent is "[m]entally ill" (CPL 330.20 [1] [d]), and for the issuance of a subsequent retention order and, pursuant to CPL 330.20 (11), a transfer order and an order of conditions.

Rivera, J.P., and Hinds-Radix, J., concur with Chambers, J.; Skelos J., concurs in part and dissents in part in a separate opinion in which Austin, J., concurs.

Ordered that the order is reversed, on the facts, without costs or disbursements, the application for the continued retention of the respondent is granted, and the matter is remitted to the Supreme Court, Orange County, for the issuance of a continued retention order in accordance with CPL 330.20 (9).